UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:06CV1652 |
| Plaintiff(s), | : | |
| | : | JUDGE O'MALLEY |
| v. | : | |
| | : | **ORDER** |
| CITY OF EUCLID, et al. | : | |
| Defendant(s). | : | |

**I. BACKGROUND**

On August 21, 2007, after a lengthy trial to the bench, the Court found that the City of Euclid's method of electing its city council violates Section 2 of the Voting Rights Act, as amended, 42 U.S.C. § 1937 ("Section 2"). As part of its ruling, the Court stayed the City's upcoming councilmanic elections until March 4, 2008. The Court then ordered the City to produce a remedial plan by August 29, 2007, and the United States (the "government") to respond to the City's proposed remedial plan by September 4, 2007. Fortunately, rather than pursuing the more contentious approach, the City and the government were able to confer and to produce a mutually agreeable remedial plan. The parties jointly contend that, using 2000 Census data, they devised a remedial plan that complies with the requirements of the Voting Rights Act, the Constitution, and local districting principles.

On September 5, 2007, the parties submitted an initial joint position statement regarding their proposed remedial plan and the conduct of the upcoming councilmanic elections. The September 5, 2007 position statement included an eight-ward remedial plan which, according to the City and

the government, cured the existing Voting Rights Act violation. (See Doc. 196, Exs. A-C, hereinafter "Plan 2a"). After hearing from the parties on September 5 and 6, 2007, however, it became clear to the Court that there remained the potential for additional refinements which would better serve community interests without interfering with the mandates of Section 2. Accordingly, the Court asked them to confer again and, utilizing the technology and resources available to the government, work to further refine the proposed remedial plan with a renewed focus on maintaining neighborhoods, local associations, and other community interests. In accordance with the Court's directives, the parties met, refined the remedial plan, and submitted it to the Court. (See Doc. 203, Exs. A-G, hereinafter "Plan 2b").

Plan 2b creates eight single-member districts within the City of Euclid while leaving intact the at-large office of council president. After agreeing upon a proposed remedial district plan, the City and the government then conferred with the Cuyahoga County Board of Elections ("BOE") to design a plan for conducting the next councilmanic elections in Euclid. The result aligns the City's next councilmanic elections with Ohio's 2008 presidential primary election. The details of the proposed plan for conducting Euclid's next councilmanic elections are set forth below.[1]

## II. REMEDIAL STANDARDS

If a district court finds a defendant's method of election violates Section 2, as the Court has here, then it is required to ensure that a legally-permissible remedy is devised. Bone Shirt v.

---

[1] Revised Plan 2b is superior to revised Plan 2a in a number of respects. First, Plan 2b has an average population deviation of 2.59%, which is lower than Plan 2a's 2.81% average deviation. Second, Plan 2b creates more compact districts than Plan 2a. (Compare Doc. 203, Exs. A-G with Doc. 196, Exs. A-C.). In Plan 2b, for instance, Ward 8 does not stretch across two-thirds of the City. Instead, Ward 8 is limited to the north central part of the City. Third, Plan 2b preserves a greater number of homeowner associations than Plan 2a. This Order, therefore, addresses the remedial standards for a Section 2 violation in contemplation of Plan 2b.

Hazeltine, 461 F.3d 1101, 1022 (8th Cir. 2006).  Under such circumstances, the defendant is given the first opportunity to propose a remedial plan.  See Reynolds v. Sims, 377 U.S. 533, 586 (1964); Cottier v. City of Martin, 445 F.3d 1113, 1123 (8th Cir. 2006); McGhee v. Granville County, N.C., 860 F.2d 110, 115 (4th Cir. 1988).  It is essential that the remedial plan correct the existing Section 2 violation and not create a new Section 2 violation.  Bone Shirt, 461 F.3d at 1022-23 (holding that the foremost obligation of a remedial plan is to correct the Section 2 violation and that the remedial plan may not violate the Voting Rights Act anew) (citing Westwego Citizens for Better Gov't v. City of Westwego, 946 F.2d 1109, 1124 (5th Cir. 1991)).  A remedial plan, moreover, "should be narrowly tailored, and achieve population equality while avoiding, when possible, the use of multi-member districts."  Bone Shirt, 461 F.3d at 1022-23.  Finally, the remedial plan "should not 'intrude on state policy any more than is necessary' to uphold the requirements of the Constitution."  Id. at 1023 (quoting Upham v. Seamon, 456 U.S. 37, 41-42 (1982) (per curiam)).  "If the remedial plan meets those standards, a reviewing court must then accord great deference to legislative judgments about the exact nature and scope of the proposed remedy."  McGhee, 860 F.2d at 115 (noting that legislative judgments reflect "a variety of political judgments about the dynamics of an overall electoral process that rightly pertain to the legislative prerogative of the state and its subdivisions.")

### A. Section 2 of the Voting Rights Act

To rectify a violation of Section 2, a corrective minority-majority district within a remedial plan must generally contain more than, "a mere majority even of voting age population in order to have a reasonable opportunity to elect a representative of their choice."  Ketchum v. Byrne, 740 F.2d 1398, 1413 (7th Cir. 1984).  To this end, a district gives minorities a reasonable opportunity to elect

candidates of choice where it has a "sufficient cushion" of approximately 60% of the voting-age population. Cottier v. City of Martin, 475 F. Supp. 2d 932, 938 (D.S.D. 2007); see also id. at 1415; African Am. Voting Rights Legal Def. Fund, Inc. v. Villa, 54 F.3d 1345, 1348 n.4 (8th Cir. 1995) (adding 5% for minorities' low voter-turnout and low voter-registration). Also, a remedial plan should provide opportunity districts in rough proportion to the minority's voting-age population. Wilson v. Jones, 130 F. Supp. 2d 1315, 1324 (S.D. Ala.), aff'd 200 F.3d 1297 (11th Cir. 2000) ("[A] prima facie remedy for dilution is provided when a districting plan includes minority controllable districts in numbers that roughly match the group's percentage of the electorate.").

Plan 2b creates opportunity districts in rough proportion to the percentage of African Americans of voting age in Euclid. By replacing the four "slotted at large" seats with four additional wards, Plan 2b allows two majority-minority districts with effective voting-age majorities of 60% or greater, while maintaining Euclid's previous nine-member council structure composed of eight council members and one council president. In District 1, African Americans represent 69.71% of the total population and 67.31% of the voting-age population. In District 3, African Americans represent 68.31% of the total population and 62.29% of the voting-age population. Importantly, the concentration of African Americans in these two opportunity districts is largely the result of the City's existing residential patterns rather than specific, purposeful plan-drawing. Second, the percentage of opportunity districts that Plan 2b creates on the nine-member council, (two of nine, or 22.22% of the seats), is roughly proportional to the overall percentage of Euclid's African-American voting-age population, 27.8%.

Maintaining the at large election of the City's council president does not perpetuate the City's Section 2 violation nor does it give rise to a new Voting Rights Act violation. As discussed above,

4

the number of opportunity districts in the proposed remedial plan is roughly proportional to the percentage of Euclid's African-American voting-age population. See Hines v. Mayor & Town Council of Ahoskie, 998 F.2d 1266, 1272 (4th Cir. 1993) ("Th[e] measure of vote dilution . . . creates what amounts to a right to usual roughly proportional representation on the part of sizeable, compact, cohesive, minority groups.") (quoting Thornburg v. Gingles, 478 U.S. 30, 91 (1986) (O'Connor, J., concurring)). The existence of an at large seat for council president already has been contemplated in this proportion.

Second, maintaining a council president elected from the City at large is not designed to dilute African-American voting strength but, rather, is consistent with the Euclid City Charter. See Euclid City Charter Art. II. Furthermore, maintaining a single at-large position intact in a system that includes two opportunity districts among eight single-member districts will not automatically give rise to a new Voting Rights Act claim. Because the proposed remedial plan remedies the existing Section 2 violation and does not give rise to a new claim, the Court defers to the judgment of the Euclid City Council. Hines, 998 F.2d at 1273 (deferring to the defendant-municipality's judgment regarding a plan that creates two majority-minority districts from a proposed remedial plan of four single-member districts and one at-large position). The proposed remedial plan before the Court here is akin to the plan approved by the district court N.A.A.C.P. v. Kershaw County, 838 F. Supp. 237 (D.S.C. 1993). In N.A.A.C.P., the court adopted a proposed remedial plan whereby six members would be elected from six single-member districts (two of which contained African American majorities) and the council chair would be elected at large. Id. at 239. In adopting the defendant's proposed remedial plan, the district court focused on whether the number of opportunity districts was roughly in proportion to the county's percentage of African-Americans, and whether

5

the Voting Rights Act prohibited mixed plans. Id. at 241-42. The district court concluded that when, "the legislative body has offered a remedy by which the protected voting group has a voting opportunity that relates favorably to the group's population . . . the Court must not only respect, but indeed must accord great deference to such a legislative choice." Id. at 241. The district court also found that where a mixed district/at large plan is proposed without the intent to diffuse minority voting strength, it is entitled to the same deference. Id. (holding that "legislatively-proposed mixed plans are not per se violative of Section 2").

### B. Population Deviation.

In Abrams v. Johnson, 521 U.S. 74, 98 (1997), the Supreme Court held that a constitutionally-permissible remedial plan "should ordinarily achieve the goal of population equality with little more than de minimis variation." See also Quilter v. Voinovich, 857 F. Supp. 579, 582 (N.D. Ohio 1994) ("We are to give states '[s]omewhat more flexibility' in their establishment of state legislative districts as opposed to federal congressional districts.") (quotation omitted). In sum, to be constitutionally adequate, a proposed remedial plan must comply with the Fourteenth Amendment's one-person-one-vote requirement. Abrams, 521 U.S. at 98. Here, moreover, the applicable local districting principles also require that municipal districts achieve population equality as nearly as possible. Euclid City Charter Art. II, § 1; see also Ohio Rev. Code Ann. § 731.06; Regensburger v. City of Bowling Green, 278 F.3d 588, 593-94 (6th Cir. 2002). The City's proposed remedial plan has an average deviation of 2.59%. This deviation is well below the 10% threshold for state and local districts that has been recognized under Federal and Ohio districting law. See, e.g., Voinovich v. Quilter, 507 U.S. 146, 161 (1993); Regensburger, 278 F.3d at 595 ("It is well-established that a plaintiff may establish a prima facie case of dilution by demonstrating a

6

population deviation in excess of 10%."). Accordingly, the Court finds Plan 2b to be in compliance with the one-person-one-vote requirement of the Fourteenth Amendment.

### C. Local Districting Principles.

Finally, as noted above, a proposed remedial plan should not "intrude upon state policy any more than is necessary" to cure any constitutional or statutory defect involved, Upham, 456 U.S. at 41-43, and should give appropriate weight to traditional districting factors. See generally L.U.L.A.C. v. Perry, 457 F. Supp. 2d 716 (E.D. Tex.2006). The Euclid City Charter requires districts to be, "as nearly equal in population as is possible, each composed of contiguous and compact territory bounded by natural boundaries or street lines." Euclid City Charter Art. II, § 1; see also Ohio Rev. Code Ann. § 731.06. Also, districts must, "not interfere with existing precinct boundaries." Euclid City Ord. 105.01. After hearing from the parties on several occasions and a close examination of revised Plan 2b, the Court finds that the City's proposed remedial plan abides by these districting principles to the greatest extent possible. As discussed above, the proposed remedial plan meets the requirements of population equality. The proposed districts are contiguous, compact, and generally follow existing precincts. Indeed, the proposed remedial plan splits few of the 48 existing precincts in Euclid. See Ex. C. Also, the proposed districts are designed to follow the natural boundaries and streets. See Ex. A. Finally, the revised plan was also conceived with the aim to minimize any division of neighborhoods and other existing community associations. See Bush v.Vera, 517 U.S. 952, 1047-48 (1996) (listing integrity of recognized community of interests among traditional districting principles widely accepted among states).

### III. ELECTION PLAN

So that the March 4, 2008, election may be administered and held with as few difficulties as

is possible, the Court **ORDERS** as follows:[2]

**(a)** **Character of the Election.** The City's March 4, 2008, councilmanic elections will be held pursuant to the following rules, notwithstanding any contrary provisions of the Ohio Constitution, the Ohio Revised Code, the Charter of City of Euclid or Codified Ordinances of the City of Euclid.

As discussed above, Euclid's city council will be comprised of nine members, one from each of the eight wards and one council president from the City at large. The Euclid City Charter requires that, "[m]embers of the Council shall be electors of the City, shall have resided in the City, and Ward Councilmen shall have resided in their respective wards for at least one year immediately preceding their election, and shall hold no public office incompatible with that of Councilman."[3] Euclid City Charter, Art. II, § 1. The qualifications for city council members will remain in full force and effect for the March 4, 2008, election, and all elections thereafter.[4] The City's March 4, 2008 councilmanic elections will be held pursuant to the following rules, notwithstanding any contrary provision of the Ohio Constitution, the Ohio Revised Code, the Charter of the City of Euclid or the Codified Ordinances of the City of Euclid.

Because the November 6, 2007, councilmanic portion of the City of Euclid's

---

[2] The following dates for the election of the City's council, to the extent possible, are aligned with the dates for the Ohio presidential primary election.

[3] For purposes of the March 4, 2008 councilmanic elections, the one-year residency requirement shall be measured from March 4, 2007.

[4] Indeed, with the exception of the new districts, this Order in no way alters the qualifications, procedures, or framework of the City, the State of Ohio, Cuyahoga County, or the BOE, for the City's regular councilmanic elections held after March 4, 2008.

municipal election has been stayed and not cancelled, for purposes of relevant Ohio statutory law, the March 4, 2008, councilmanic election shall be part of "the same election" as the municipal election being held on November 6, 2007.

To ensure expeditious, efficient, and proper councilmanic elections, the Court previously ordered the BOE to hold the City's currently stayed, nonpartisan councilmanic election on March 4, 2008, in conjunction with Ohio's presidential primary election. To facilitate this, the BOE shall provide proper ballots for the City's councilmanic elections to all electors who vote in the presidential primary.

**(b)** **Nominating Petitions.** Nominating petitions for candidates for all council seats must be filed by 4:00 p.m. on January 4, 2008 – sixty (60) days prior to the March 4, 2008 election. Ohio Rev. Code. Ann. § 3513.05. Because all wards of the City have changed, both in geographical configuration and in the number and composition of electors residing in such wards, and because the Court previously stayed the certification of any nominating petitions that may have already been filed with the BOE, all candidates for the councilmanic election to be held on March 4, 2008, must file new nominating petitions.

Due to the unique circumstances of this election and the unavailability of data based on the newly created wards, candidates for Ward council positions must file a nominating petition signed by not less than twenty-five (25) registered electors in their respective new wards. For purposes of the March 4, 2008, election, "new ward" means the wards as drawn in the City's proposed remedial Plan 2b. (See Doc. 206).

Because the position of President of Council is a citywide elected position and this Order does not affect the boundaries and configuration of the City of Euclid, all candidates

9

for President of Council who have already filed nominating petitions for the Position of President of Council need not file new nomination petitions. If a person has circulated but not filed a nominating petition for the position of President of Council for the November 6, 2007 councilmanic election, that person may use said petition for the March 4, 2008 councilmanic election, provided that said petition is filed by the deadline established above. Any person who desires to run for the position of President of Council who has not filed or circulated a nominating petition or any person who filed a petition for the position of a Citywide member of Council, slotted as A,B,C, or D (positions which have been eliminated) and who now desires to run for the position of President of Council, must file a new nominating petition by the deadline established above. Said nominating petition must be signed by registered electors of the City not fewer in number than two percent (2%) of the number voting in the City at the last preceding general election. Euclid City Charter, Art. VII, §1. As defined for purposes of the March 4, 2008, election, "the last preceding general election" will mean the election held in November 2006, not the upcoming general election on November 6, 2007.

**(c)** **Filing Fees.** For those candidates for councilmanic election on March 4, 2008, who have already paid their filing fees and filed a nominating petition, the BOE shall waive any fees for filing new petitions for the March 4, 2008 election. The filing fees for those candidates for councilmanic election who have already paid their filing fees and filed a nominating petition for a councilmanic position that no longer exists (slotted, Citywide council positions) or a councilmanic position that has been changed (Ward council) and who no longer desire to run for election shall be refunded by the BOE upon the candidates' request.

10

**(d)** **Certification of Petitions.** The BOE shall certify the validity and sufficiency of the candidates' petitions fifty-three (53) days prior to the March 4, 2008, election, on January 11, 2008. See Ohio Rev. Code Ann. § 3513.05.

**(e)** **Petition Protests.** Protests may be filed, "by any qualified elector eligible to vote for the candidate whose nominating petition he objects to." Ohio Rev. Code Ann.§ 3513.263. Protests against candidates' petitions must be filed on January 15, 2008, forty-nine (49) days prior to the March 4, 2008, election. Ohio Rev. Code Ann. §3513.05.

**(f)** **Certification of Election Results.** Pursuant to Ohio statute, the results of the March 4, 2008 election shall be certified to the Ohio Secretary of State on April 4, 2008. See Ohio Rev. Code Ann. §§ 3505.32, 3505.33.

**(g)** **Terms of Office.** The term of all members elected to Euclid's city council on March 4, 2008, will commence on Saturday, April 5, 2008, and will end on November 30, 2009. The government, the City, and the Court agree that it is in the best interest of the electorate for the present city council to remain intact until April 4, 2008.

**(h)** **Remaining Dates.** All other dates, including but not limited to, applications by mail for absentee ballots, voter registration for the election, and voting of absentee ballots will follow the deadlines established for partisan primaries that include a presidential primary. In all subsequent councilmanic elections, the conduct of elections – as opposed to the method of election – will be governed by the applicable sections of the Charter of the City of Euclid, the Codified Ordinances of Euclid, and laws of the State of Ohio.

**IV.     CONCLUSION**

The Court finds that the City of Euclid, working in conjunction with the United States, has

created a proposed remedial ward plan (Plan 2b) which remedies the Section 2 violation by creating opportunity districts in rough proportion to Euclid's African-American voting-age. Furthermore, the Court finds that the proposed remedial plan is generally consistent with local districting principles such as population equality, compactness, contiguousness, and integrity of precinct lines population and does not create any new Voting Rights Act violations.

The parties, including Defendant Cuyahoga County Board of Elections, have also devised a plan for *conducting* the March 4, 2008, councilmanic elections. (See Docs. 196, 203, 206). By holding the councilmanic elections on the same day as the presidential primary election, the parties have synchronized the elections to provide efficiencies and acheive the greatest possible voter turnout under the circumstances. The resulting plan for conducting Euclid's next councilmanic elections based on the proposed remedial plan, moreover, offers minimum deviations from state and local law. Accordingly, the Court **ORDERS** the City's wards to be redrawn in accordance with Plan 2b, utilizing the map submitted on Monday, October 29, 2007 (See Doc. 207, Ex. A)[5] and for Euclid's March 4, 2008 councilmanic election to be conducted as described above.

**IT IS SO ORDERED.**         s/ Kathleen M. O'Malley
                                           **KATHLEEN McDONALD O'MALLEY**
                                           **UNITED STATES DISTRICT JUDGE**

**DATED: October 29, 2007**

---

[5] The latest map contemplates an exchange of uninhabited land between Euclid and the City of Cleveland which did not result in a change of the electorate population from Plan 2b.