**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No. 1:06cv01652** |
| | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| **Plaintiff(s),** | : | |
| **v.** | : | |
| | : | |
| | : | **ORDER** |
| **CITY OF EUCLID, et al.,,** | : | |
| | : | |
| **Defendant(s).** | : | |

## I.    INTRODUCTION

On July 10, 2006, the United States (the "government") filed a complaint, alleging that the

City of Euclid's ("Euclid" or the "City") method of electing its City Council, using a combination

of single-member districts and slotted, at-large positions, results in the dilution of African-American

voting strength, in violation of Section 2 of the Voting Rights Act, as amended, 42 U.S.C. § 1937

("Section 2").  After a bench trial beginning on August 6, 2007, this Court agreed.

In a lengthy oral ruling delivered on August 21, 2007, the Court found that the government

had demonstrated that Euclid's method of electing its City Council violated Section 2.  Based on this

finding, the Court stayed all of the City's then-scheduled councilmanic elections, as well as all pre-

election filing obligations attendant thereto.  The parties and the Cuyahoga County Board of

Elections agreed that March 4, 2008, the date for the then-upcoming presidential primary election,

was the most appropriate date on which to conduct a special election for the City's councilmanic

seats.  The Court, thus, set March 4, 2008 as the date on which councilmanic elections would be held

and ordered the parties to propose a remedy which could be implemented fully prior to that election.

1

On September 18, 2007, the City, with the assistance of the government, submitted a final remedial plan (the "Plan") that both parties agreed remedied the existing Section 2 violation.  In sum, the Plan proposed dividing Euclid into eight single-member districts, while retaining the at-large council president position.  On October 29, 2007, the Court found that the Plan remedied the Section 2 violation while still remaining true to important local districting principles.

With the help of the Board of Elections, the City implemented the approved remedial plan. On March 4, 2008, a special councilmanic election was held.  On that date, for the first time in the City's history, an African-American was elected to the Euclid City Council, having been elected from one of the majority-minority districts established by the remedial plan.[1]

The purpose of this order is to affirm the many rulings made by the Court in the course of this litigation and to set forth the findings of fact and conclusions of law upon which those determinations were premised. [2]

## II.    BACKGROUND

### A.    Demographics and Geography

During the first half of the twentieth century, the City of Euclid was a predominantly white suburb of Cleveland.  As late as the 1970s, African-Americans represented only one-half of one percent of Euclid's total population.  (Sugrue Test., Trial Tr. 979:9-25.)  In the 1980s, Euclid began

---

[1]

 Kandace Jones of Ward 3 was elected to serve as the first ever African-American member of the Euclid City Council.

[2] The government filed its *Proposed Findings of Fact and Conclusions of Law* (Doc. 205) on October 22, 2007, and Euclid filed its *Objection to the United States' Post-Trial Findings of Fact and Conclusions of Law* (Doc. 209) and proposed its own findings of fact and conclusions of law on November 5, 2007.  The Court reaches its own conclusions with the aid of these thorough and well-written proposals.

to grow more diverse, with the African-American population increasing to 7.8% of Euclid's total population.  (Id.)  From the 1980s through the present, the African-American population has increased in Euclid, and the City's white population (and its total population) generally has decreased.  (See Population of Euclid Races, Trial Ex. 66.)  By the 1990 Census, 16.2% (8,871) of Euclid's total population of 54,875 was African-American.  (Id.)  According to the most recent Census (for 2000), Euclid has a total population of 52,717, of which 30.5% (16,297) is African-American, and 65.7% (34,678) is white.  (Sugrue Test., Trial Tr. 979:9-25; Ex. 66.)

Euclid is located in the northeast corner of Cuyahoga County, approximately twelve miles east of downtown Cleveland.  The City is linked to Cleveland by Interstate 90 ("I90"), which roughly bisects Euclid.  (Sugrue Test., Trial Tr. 980:11-981:2.)  The area to the north of I90 is predominantly residential, with large numbers of small single-family, mid-twentieth century homes and several high-rise apartments, situated on the south shore of Lake Erie. (Id. 980:11-983:17, 987:14-988:8.)  Currently, the population of the northern section of Euclid is predominately white, and includes significant Slovenian and Irish ethnic communities.  (See Cervenik Test., Trial Tr. 359:2-12.)  Immediately to the south of the interstate is an unpopulated industrial zone.  (See id. 358:21- 359:1; Sugrue Test., Trial Tr. 980:11-982:8.)  Farther south of the industrial area is an additional residential area.  (Id.)  The large industrial zone, when combined with the interstate, serves as a geographical divide between the northern and southern residential areas of Euclid.  (Id.)  The southern residential area of the City is comprised primarily of single-family homes and numerous multi-unit apartment buildings.  (Id.)  The southeast and southwest corners of Euclid are predominantly African-

3

American, and are separated by an area of south-central Euclid that is predominantly white.[3]  (Sugrue Test., Trial Tr. 979:24:-980:10; GIS Map, Percent Black Non-Hispanic Population by 2000 Census Block, Euclid, Ohio, Ex. 82.)

      **B.**      **Euclid City Council's Method of Election**

The Euclid City Council is the governing board of the City of Euclid.  Euclid, Oh. City Charter, art. II, § 1.  It is composed of nine members, each of whom is elected in odd-numbered years to two-year concurrent terms.  Id.  Four of the eight councilmanic seats are elected from single-member districts, four are elected at-large from numbered posts, and one is elected at-large to serve as the president of the City Council.  Id.  Councilmanic elections are nonpartisan, and no primary elections are held.  (City of Euclid's Answers to the United States' First Set of Requests for Admission, Ex. 122 Nos. 45-46.)  In the event that more than two candidates run for a seat and no candidate obtains a majority, the candidate who obtains a plurality of the vote is elected.  Euclid, Oh. City Charter, art. VII, § 1.  The method of election is set by the Euclid City Charter.  Euclid, Oh. City Charter, art. II, § 1.  Amendments to the city charter must be approved by a majority of Euclid's voters after having been put to the ballot by two-thirds of the City Council or by petition signed by ten percent of the registered voters.  Euclid, Oh. City Charter, art. X, §§ 1, 2.  The City Council may submit a proposed amendment to the voters at any time or it may wait to consider proposed amendments suggested by the Charter Review Commission.  Id.

Prior to 1991, the four at-large council seats were elected in a multi-seat contest, with the top four vote-getters winning the office regardless of the number of candidates.  (City of Euclid's

---

[3] Much of the south-central area is perched atop a hill and largely surrounded by parkland. These natural barriers, in part, serve to separate the area from the other residential zones in southern Euclid.

4

Answers to the United States' First Set of Requests for Admission, Ex. 122 No. 47; Jerse Test., Trial Tr. 1208:7-1209:23.)  In 1992, the Charter Review Commission proposed, and Euclid voters ultimately approved, a change to numbered posts for the City Council's at-large members.  (City of Euclid's Answers to the United States' First Set of Requests for Admission, Ex. 122 Nos. 48-49; Jerse Test., Trial Tr. 1209:24-1210:4, 1211:4-8.)

The City Council is responsible for redistricting, "within sixty days after the proclamation by the Secretary of State announcing the population of cities of Ohio, as determined by the Federal census decennially taken."  Euclid, Oh. City Charter, art. II, § 1.  In undertaking its redistricting duties, the City Council is to, "redivide the City into four wards which shall be as nearly equal in population as is possible, each composed of contiguous and compact territory bounded by natural boundaries or street lines."  Id.  After the 2001 redistricting, none of Euclid's four wards had an African-American, voting-age majority.  (Handley Test., Trial Tr. 85:16-23.)  In 2006, the City Council engaged in a mid-decade redistricting that had the effect of lowering the African-American, voting-age population in Ward 4, a ward which, at the time, had the highest concentration of African-Americans.  (See Handley Test., Trial Tr. 88:5-22.)

### C.      Summary of African-American Participation in Euclid Politics

Never in the history of the City of Euclid has an African-American been elected as its mayor, council president, a member of its council, or to serve on its school board.  Since 1981, African-American candidates have run for Euclid City Council positions ten times, and each time the African-American candidate has lost.  The first African-American candidate to run for City Council was Rose Allen, who, in 1981, ran for the Ward 2 council seat.  (Allen Test., Trial Tr. 1172:21-1173:19.)  In short, beginning with Robert Butler in 1989, (Corbran Test., Trial Tr. 534:13-538:18),

and continuing through the most recent councilmanic election, every African-American candidate for a seat on council in Euclid has lost, often placing last behind multiple white candidates.[4]

Since 1987, moreover, three African-Americans have run in, and lost, elections for the Euclid City Schools Board of Education.[5]  The first of these unsuccessful candidates was Marsha Morrell-Curtis, who ran and lost in 1987.  (See Drake Test., Trial Tr. 941:1-9.)  The second, Howard Drake, ran as an appointed incumbent to the school board in 1999 and lost.  (Id. 894:10-25.)  Two years earlier, in 1997, the school board and the school district's superintendent appointed Mr. Drake to fill a vacant, unexpired school board seat.  (Id. 895:14-896:4.)  Though there were only three candidates for two seats, Mr. Drake finished last to fellow incumbent Kay Van Ho and challenger Michael McPhillips.  (Table: Euclid Local Non-Council Elections that Include African-American Candidates, Trial Ex. 88.)  Parris Rice, the third African-American candidate for Euclid school board, ran in 2001 for one of the three open seats.  (Id.)  Ms. Rice also finished last.  (Id.)

---

[4] With respect to councilmanic elections, Mr. Robert Butler ran in 1989 and lost.  George Rice ran in 1995 for Ward 3 against two white candidates and lost.  Four years later, "Jai" Walton, a well-known community activist, ran in Ward 3 and lost.  In that same year, Mac Stevens, a former Cleveland Browns professional football player, ran and lost in Ward 4. In 2001, "Jai" Walton ran again and Sharon Hawthorne, who had been active in local political and community organizations, also ran, and both lost.  In 2003, Ms. Walton and Ms. Hawthorne ran for two of the at-large councilmatic seats and lost, and Clarence Dunn ran for Ward 2 councilman and lost.  (Corbran Test., Trial Tr. 543:13-538:18, 545:22-546:17; Walton Test. Trial Tr. 399:18-400:21, 411:1-13; Hawthorne Test., Trial Tr. 571:2-3; )

[5] The Euclid City Schools Board of Education consists of five members, each of whom is elected at large to staggered, four-year terms.  Ohio Rev. Code Ann. §§ 3313.02, 3313.08, 3313.09.  The elections are nonpartisan and there are no primaries; the candidates receiving the top two or three vote totals are elected.  Id.

**D.      Hillandale Rezoning Referenda and the Mayoral Retention Election**

In 2002, Providence Baptist Church, a Cleveland-based, predominantly African-American congregation, purchased a plot of land in Euclid's Hillandale area with the intent to build both a branch of its church and a housing development.  (Cervenik Test., Trial Tr. 308:9-20.)  Because the Hillandale property was zoned for industrial use, the church needed the property to be re-zoned.  (Id.) The Euclid Planning and Zoning Board initially denied the church's rezoning applications because it wanted more information related to design and construction issues.  (Id. 308:21-25.)  It subsequently approved the church's rezoning applications after being presented with all of the information it requested.  (Id. 309:9-23.)  The re-zoning applications were then passed to the City Council for consideration.  (Id. 309:24-310:4.)  What resulted were numerous public hearings that were marked by racially divisive rhetoric.  (Id. 310:2-19.)  One concern voiced by opponents of the Hillandale project was that the housing development would be sold primarily to Providence Baptist Church parishioners.  (See, e.g., Corbran Test., Trial Tr. 568:9-19.)

On February 2, 2004, the City Council approved the re-zoning application by a five to four vote.  Pursuant to the Euclid City Charter, members of a local group called the Euclid Awareness Committee successfully circulated petitions to bring the re-zoning applications before the voters. (City of Euclid's Answers to the United States' First Set of Requests for Admission, Ex. 122, Nos. 32-34.)  While the Euclid Awareness Committee campaigned against the referenda, Providence Baptist Church filed suit against the City.[6]  (See Providence Baptist Church v. City of Euclid, First Amended Compl., Civ. A. No. 04-00746 (N.D. Ohio Sept. 24, 2004) and attachments, Ex. 116.)  On November 2, 2004, Euclid voters overwhelmingly rejected both rezoning applications.  (Id. Nos. 36-

---

[6] Additional facts related to the Hillandale rezoning matter are described in Providence Baptist Church v. Hillandale Comm., Ltd., 425 F.3d 309, 315-16 (6th Cir. 2005).

7

37; Table 3: Select Euclid City Referenda, Ex. 89.)  Shortly thereafter, Mayor William Cervenik entered into a settlement agreement with the church whereby the church would be allowed to build both the church building and the housing development. (Cervenik Test., Trial Tr. 373:23-374:3; City of Euclid's Answers to the United States' First Set of Requests for Admission, Ex. 122, No. 38.)

In part because of the settlement, the Euclid Awareness Committee, now renamed the Euclid Recall Awareness Committee, successfully circulated petitions for a mayoral retention election. (See City of Euclid's Answers to the United States' First Set of Requests for Admission, Ex. 122 Nos. 40-42.) Many in Euclid viewed the mayoral retention election as having racial overtones. (See, e.g., City Council Minutes, June 6, 2005, Ex. 2027 31; City Council Minutes, June 20, 2005, Ex. 2028 34-37; City Council Minutes, Mar. 6, 2006, Ex. 2029 9-11.)  This was due to lingering resentment from the Mayor's decision to settle the Hillandale lawsuit.  On July 12, 2005, 54.2% of Euclid voters voted to retain the mayor.  (Select Euclid City Referenda, Ex. 89.)

## III.  LEGAL FRAMEWORK

### A.  Section 2 of the Voting Rights Act

Section 2 of the Voting Rights Act prohibits any State or political subdivision from imposing or applying "any qualification or prerequisite" to voting or "any standard, practice, or procedure" which "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or membership in a language minority group.  42 U.S.C. § 1973.  Section 2 ensures that minority voters are free from any election practice, "which operate[s], designedly or otherwise" to deny minority voters the same opportunity to participate in all phases of the political process as other citizens enjoy.  S. Rep. No. 97-417 at 28.  Minority voters are not required to show that the jurisdiction intended to deny them the same opportunity to participate in the political

8

process; instead, they need only show that the challenged election practice, "result[s] in the denial of equal access to any phase of the electoral process for minority group members." S. Rep. No. 97-417 at 30 (1982).  In other words, "[n]o showing of discriminatory intent is required to prove a violation of § 2." Coleman v. Bd. of Educ. of the City of Mount Vernon, 990 F. Supp. 221, 227 (S.D.N.Y. 1997) (citing Chisom v. Roemer, 501 U.S. 380, 384 (1991)).  The issue is impact, not purpose.

The goal of Section 2 is not to guarantee success at the polls for minority preferred candidates, but to provide assurance of fairness in the electoral process. Johnson v. DeGrandy, 512 U.S. 997, 1014 (1994). "At large voting in a multimember political unit . . . may prevent minorities from electing representatives of their choice by diluting their voting strength." Collins v. City of Norfolk, 883 F.2d 1232, 1236 (4th Cir. 1989) (citing Thornburg v. Gingles, 478 U.S. 30, 47-48 (1986)) ("Collins II").  While "at large voting for multimember offices does not *per se* violate minority rights[,] [if minority] voters . . . prove that this electoral system 'operates' to minimize or cancel their ability to elect their preferred candidate," a Section 2 violation is established. Id.  A plaintiff must show that, "based on the totality of circumstances, . . . the political processes leading to nomination or election in the state or political subdivision are not equally open to participation by members of a class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b).

9

B.    ***Thornburg v. Gingles* and the Senate Factors**

Racial bloc voting is a necessary precondition to a Section 2 violation.  In Gingles, the

Supreme Court set forth the three preconditions necessary to establish the existence of racial bloc

voting - compactness, cohesion and racial polarization.  As the Court explained:

> First, the minority group must be able to demonstrate that it is sufficiently large and
> geographically compact to constitute a majority in a single-member district.  If it is
> not, as would be the case in a substantially integrated district, the multi-member form
> of the district cannot be responsible for minority voters' inability to elect its
> candidates.  Second, the minority group must be able to show that it is politically
> cohesive.  If the minority group is not politically cohesive, it cannot be said that the
> selection of a multimember electoral structure thwarts distinctive minority group
> interests.  Third, the minority must be able to demonstrate that the white majority
> votes sufficiently as a bloc to enable it – in the absence of special circumstances,
> such as the minority candidate running unopposed – usually to defeat the minority's
> preferred candidate.

Gingles, 478 U.S. at 50-51 (internal citations omitted).  The Gingles Court found the existence of

racial bloc voting to be significant because it indicates that a minority group is regularly deprived

of an opportunity to choose candidates of its choice, and that candidates chosen by majority voters

may be indifferent to the needs of the minority group without fear of political repercussions.  Nixon

v. Kent County, 790 F. Supp. 738, 746 (W.D. Mich. 1992).

Satisfaction of the three Gingles preconditions gives rise to an inference that a Section 2

violation has occurred.[7]  Teague v. Attala County, 92 F.3d 283, 293 (5th Cir. 1996).  Existence of

the preconditions does not, standing alone, establish a Section 2 violation, however.  If the

preconditions are satisfied, the Court must then determine whether, based on the "totality of

---

[7] Failure to satisfy the preconditions – *i.e.*, to establish the predicates that would indicate
the presence of racial bloc voting in the challenged political subdivision – ends the
Section 2 inquiry.  Gingles, 478 U.S. at 48-50.

10

circumstances," minority voters possess the same opportunities to participate in the political process and to elect representatives of their choice.  Gingles, 478 U.S. at 43.  While there are no limits on the circumstances a Court may consider when making this inquiry, guidance does exist in the form of a non-exhaustive list of factors found in the Senate Report that accompanied the 1982 amendments to the Voting Rights Act (the "Senate Factors").  See Gingles, 478 U.S. at 44-45. While not prerequisites themselves, and not the exclusive inquiries, courts regularly employ these factors as the first lines of inquiry in assessing the totality of the circumstances surrounding the voting practices and patterns in the relevant district or subdivision.  The seven Senate Factors are:

1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. The extent to which voting in the elections of the state or political subdivision is racially polarized;

3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

11

6.    Whether political campaigns have been characterized by overt or subtle racial appeals;

7.    The extent to which members of the minority group have been elected to public office in the jurisdiction.

See S. Rep. No. 97-417, at 28-29 (footnotes omitted).  The Senate Report recognized two further factors that, in some cases, warrant consideration as part of plaintiffs' evidence to establish a violation: (1) "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;" and (2) whether "the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."  Id. at 29 (footnotes omitted).  The Senate Report observed that, while all of the factors "assist the court in determining whether, in the totality of the circumstances, vote dilution exists," it is not necessary that "any particular number of factors be proved, or that a majority of them point one way or the other."  Id.

Since the 1982 amendments, courts have recognized two additional factors that are probative of the existence of vote dilution.  The first additional factor, proportionality, compares the number of existing majority-minority districts to the minority population percentage.  See DeGrandy, 512 U.S. at 1014 n.11.  Unlike Senate Factor Seven, which looks to the "political or electoral" success of minority candidates, proportionality looks to "the political or electoral power of minority voters." Old Person v. Brown, 312 F.3d 1036, 1042 (9th Cir. 2002) (quoting DeGrandy, 512 U.S. at 1014 n.11).  The second additional factor is racial separation.  "[O]n-going racial separation . . . – socially, economically, religiously, in housing and business patterns – makes it especially difficult for [minority] candidates seeking county-wide office to reach out to and communicate with the

12

predominantly white electorate from whom they must obtain substantial support to win . . . at-large elections." United States v. Charleston County, 316 F. Supp. 2d 268, 291 (D.S.C. 2003), aff'd, 365 F.3d 341 (4th Cir. 2004); see McMillan v. Escambia County, 688 F.2d 960, 967-68 (5th Cir. 1982), factual findings adopted by 748 F.2d 1037 (5th Cir. 1984).  This factor differs from Senate Factor Five in that racial separation serves as a barrier to minority candidates while socioeconomic disparities serve as a barrier to minority voters.

While the Court must analyze carefully the totality of the circumstances, as noted above, the "[e]stablishment of the Gingles preconditions presages Section 2 liability." Charleston County, 316 F. Supp. 2d at 277; Sanchez v. Colorado, 97 F.3d 1303, 1310 (10th Cir. 1996) (stating, the establishment of the Gingles preconditions "creates the inference the challenged practice is discriminatory.").  Thus, it would be the "unusual case in which the plaintiffs can establish the existence of the three Gingles factors but still have failed to establish a violation of [Section] 2 under the totality of the circumstances." Teague v. Attala County, 92 F.3d 283, 293 (5th Cir. 1996) (quoting Clark v. Calhoun County, 21 F.3d 92, 97 (5th Cir. 1994)).

## IV.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    The Gingles Preconditions

#### 1.    First Gingles Precondition – Compactness

The first Gingles precondition requires a finding that the minority group, "is sufficiently large and geographically compact to constitute a majority in a single-member district." Mallory v. Ohio, 173 F.3d 377, 382 (6th Cir. 1999) (citation and internal quotation marks omitted).  This is accomplished by a showing that the minority group represents a majority in one of the districts in an illustrative single-member-district plan. Valdespino, 168 F.3d, at 852-53; Cousin v. Sundquist,

13

145 F.3d 818, 828-29 (6th Cir. 1998); <u>Parker v. Ohio</u>, 263 F. Supp. 2d 1100, 1104-05 (S.D. Ohio 2003) (three-judge district court)).  In assessing whether such a single-member district could theoretically be drawn, the Court is to be guided both by common sense and all applicable local and constitutional districting principles.  In other words, the Court may not find the existence of a single-member majority district where to do so would require creating a district which is unduly large, strangely configured, discontiguous, or mixes radically diverse constituencies.  <u>Gingles</u>, 478 U.S., at 50 n. 17.

Here, Dr. Lisa Handley, the government's racial bloc voting expert, presented an illustrative plan that contained eight compact, contiguous, single-member districts while maintaining the one-person, one-vote requirements.  (Handley Test., Trial Tr. 89:4-90:9; GIS Map, Euclid 8-district Plan with Black Non-Hispanic VAP by Census Block, Ex. 85.)[8]  Two of these eight districts, Districts 1 and 3, contain African-American voting-age populations of over 67% and 56%, respectively. [9] (Handley Test., Trial Tr. 89:4-90:9; <u>see</u> <u>also</u> Ex. 85.)  None of the districts violated the legal and common-sense districting principles by which this Court is to be guided.

---

[8] The government's demographic information is derived from the 2000 Census.  While the City has attacked the use of this data as outdated, despite an opportunity to do so, the City has never provided reliable updated data which would give the Court an alternative benchmark against which to measure the issues presented.  As a result, the 2000 Census data represents the only meaningful data before the Court.  The Court will both refer to the 2000 Census data, and accord it the presumption of accuracy to which it is entitled.  <u>See McNeil v. Springfield Park Dist.</u>, 851 F.2d 937, 946 (7th Cir. 1988) ("The census is presumed accurate until proven otherwise.  Proof of changed figures must be clear and convincing to override the presumption.") (citations omitted).

[9] After trial, Dr. Handley's theoretical majority-minority districts were revised.  The final ward plan adopted by the Court included two majority-minority districts where African-Americans represent 67.31% and 62.29% of the voting-age population.  (<u>See</u> Doc. 203, Exs. A-G).

Euclid argues, however, that the United States has failed to prove the first <u>Gingles</u> precondition because, while concededly containing bare majorities, the two majority-minority districts do not contain an "effective" majority voting population.  In support of its argument, Euclid relies on Dr. Jeffrey Zax's "estimated actual voters" analysis, in which Dr. Zax selected African-American turnout rates from at-large contests or from ward contests that were separate from the two hypothetical districts.  (<u>Id.</u> 1317:9-1319:11.)  Based on this analysis, Dr. Zax concludes that the minority population in Dr. Handley's hypothetical districts would not represent a voting majority who could *assure* election of its preferred candidate.  Dr. Zax's "estimated actual voter" analysis, however, is at odds with Dr. Handley's reconstituted election analysis.[10]  Where Dr. Zax's "estimated actual voter" analysis predicted that the African-American-preferred choice would never prevail, because many voting age African-Americans would not likely vote, (<u>id.</u> 1304:20-1305:9), Dr. Handley demonstrated persuasively that the African-American-preferred choice would generally prevail in the two illustrative districts.  (<u>Id.</u> 93:15-25; Handley's Rebuttal Report Appendix A – Reconstituted Election Results Analysis, Ex. 97.)  While Dr. Zax's inquiry into the *effectiveness* of districts may be an appropriate consideration in the remedial phase of a Section 2 trial, it has little relevance in the context of the first <u>Gingles</u> precondition.  (<u>See</u> Handley Test., Trial Tr. 91:7-20.)

Dr. Zax's "estimated actual voters" analysis implicitly requires a Section 2 plaintiff to show that more minorities would actually vote, or that minority preferred candidates would be successful.  Courts have not imposed such requirements.  See <u>Valdespino v. Alamo Heights Indep. Sch. Dist.</u>,

---

[10] Reconstituted election analysis takes the actual precinct results for previous elections and re-tabulates the elections to the new districts in order to determine if the minority-preferred choice would prevail.  (<u>Id.</u> 92:3-8.)  This method of analyzing the effectiveness of districts has been accepted by other courts.  <u>See</u>, <u>e.g.</u>, <u>Johnson v. Miller</u>, 864 F. Supp. 1354, 1391 (S.D. Ga. 1994) (relying on reconstituted election analysis).

168 F.3d 848, 852-53 (5th Cir. 1999).[11]  Instead, courts have consistently held that the only question

relevant to the first <u>Gingles</u> precondition is whether the affected minority group represents a voting-

age majority of a hypothetical district in an illustrative plan.  <u>See</u>, <u>e.g.</u>, <u>Perez v. Pasadena Indep. Sch.</u>

<u>Dist.</u>, 165 F.3d 368, 372 (5th Cir. 1999) (requiring, for purposes of <u>Gingles</u>, consideration of citizen

voting age population for minority groups with lower citizenship rates); <u>McNeil</u>, 851 F.2d at 942

(affirming lower court's interpretation of the first <u>Gingles</u> precondition to require that the illustrative

district have an African-American voting age majority); <u>Black Political Task Force v. Galvin</u>, 300

F. Supp. 2d 291, 300-01 (D. Mass. 2004) (discussing the use of voting age population to determine

the first precondition of <u>Gingles</u>).  Thus, while it is true that the inquiry must be narrower than a pure

population estimate, and must focus on the voting-age population, there is no reasoned or legal basis

upon which to narrow the inquiry further in the context of this case.[12]  In short, Dr. Zax's analysis

presupposes a legal test – <u>i.e.</u>, an effectiveness measure – which no court has ever employed and this

Court declines to adopt. [13]

Dr. Handley, the government's expert, has convincingly demonstrated that, in Euclid, an

eight-district plan can be fairly constructed so that African-Americans of voting age would represent

---

[11] Where the majority-minority is narrow, or must rely upon crossover voting to be successful in electing a minority-preferred candidate, the efficacy of a proposed district may require greater scrutiny. <u>See</u> <u>Thompson v. Glades County Bd. of County Comm'rs</u>, 508 F.3d 975 (11th Cir. 2007) (en banc) (vacating an earlier Eleventh Circuit panel decision to reexamine, <em>en banc</em>, issues arising under <u>Gingles</u>' first precondition).  Here, however, because the minority-majorities exceed 60%, those issues do not arise.  (<u>See</u> Doc. 203, Exs. A-G).

[12] While some courts have narrowed the population inquiry to take into account the presence of a substantial voting-age population who are not <em>qualified</em> to vote, (<u>See</u>, <u>e.g.</u>, <u>Perez</u>, 165 F.3d at 372), no such circumstance exists here.

[13] The danger posed by employing such a measure is patent; a particular voting-age population may have been "ineffective" in the past because of the very vote dilution it seeks to remedy.

a majority in two districts.  As noted in the Court's previous Order, the Plan adheres to the one-person one-vote requirement, contains reasonably compact wards with relatively homogenous constituencies that are bounded by natural community boundaries and retains important local districting principles.  In short, the Court finds that the compactness element of the <u>Gingles</u> test has been satisfied. [14]

### 2.    Second and Third <u>Gingles</u> Preconditions – Racial Bloc Voting

Racial bloc voting exists "where there is 'a consistent relationship between [the] race of the voter and the way in which the voter votes,' . . . or to put it differently, where 'black voters and white voters vote differently.'"  <u>Gingles</u>, 478 U.S. at 53 n.21 (adopting Dr. Bernard Grofman's definition of racial bloc voting).  Minority voters are cohesive when they, as a group, support the same candidates consistently over a number of elections.  See <u>E. Jefferson Coal. for Leadership & Dev. v. Jefferson Parish</u>, 691 F. Supp. 991, 1000-01 (E.D. La. 1988).  Thus, cohesiveness is established when "a significant number" of minority voters "usually" vote for the same candidate.  <u>Gingles</u>, 478 U.S., at 56-57.  The majority votes as a bloc when it routinely votes against the minority-preferred candidate.  See <u>Cousin</u>, 145 F.3d at 823 (citing <u>DeGrandy</u>, 512 U.S. at 1007; <u>Gingles</u>, 478 U.S. at 50-51).  Legally significant racial bloc voting exists when the minority group is politically cohesive and the majority votes sufficiently as a bloc to enable it to usually defeat the minority-preferred choice.  <u>Gingles</u>, 478 U.S. at 56.  "The legal standard for the existence of racially polarized voting looks only to the difference between how majority votes and minority votes were cast."  <u>Collins v. City of Norfolk</u>, 816 F.2d 932, 935 (4th Cir. 1987) ("Collins I").  Therefore, this inquiry, which

---

[14] Euclid first indicated a willingness to concede the issue of compactness.  Given the strength of the evidence on this point and the fact that much of the attack on that evidence was legally irrelevant, the City likely should have adhered to its original inclinations on this point.

entails both the second and third <u>Gingles</u> preconditions, is a functional analysis.  <u>Gomez v. City of Watsonville</u>, 863 F.2d 1407, 1415 (9th Cir. 1988).

### (a)  Statistical Evidence of Racial Bloc Voting

In assessing whether racial bloc voting exists in a designated political subdivision, courts often begin with a statistical analysis of voting behavior.  <u>Campos v. City of Baytown</u>, 840 F.2d 1240, 1244 (5th Cir. 1988); <u>see</u> <u>also</u> <u>Monroe v. City of Woodville</u>, 897 F.2d 763, 764 (5th Cir. 1990) ("Statistical proof of political cohesion is likely to be the most persuasive form of evidence, although other evidence may also establish this phenomenon."); <u>Bone Shirt v. Hazeltine</u>, 336 F. Supp. 2d 976, 995 (D.S.D. 2004), <u>aff'd</u>, 461 F.3d 1011 (8th Cir. 2006), ("Proving this factor typically requires statistical evaluation of elections.").  It is important to keep in mind, however, that the Court's job is to assess the broader legal principles described in <u>Gingles</u>; it is neither to be wedded to, nor hamstrung by, blind adherence to statistical outcomes.  Statistics are tools to aid the Court's analysis.  There are no bright line absolutes to which this Court must adhere in assessing the question of whether racial bloc voting existed in Euclid.  As a result, while courts have found certain particular statistical or mathematical outcomes to be compelling evidence *in the context of the cases before them*, no decision out of either the Supreme Court or the Sixth Circuit (or any other Circuit for that matter) requires the use of a particular statistical methodology, or demands a particular statistical outcome before a court may conclude that racial bloc voting exists.  Euclid's contention to the

18

contrary, and request that this Court find that failure to satisfy its proposed statistical benchmarks requires judgment as a matter of law in the City's favor, is wrong. [5][1]

The Court, thus, turns to the question of statistics with this perspective in mind. Statistical evidence of racial bloc voting may be established by three analytical models: homogenous precinct analysis ("HPA"), bivariate ecological regression analysis ("BERA"), and King's ecological inference method ("King's EI method"). See Bone Shirt, 336 F. Supp. 2d at 995-96 (discussing various statistical methods relied upon by courts in analyzing evidence of racial bloc voting). Since Gingles, courts have relied on HPA and BERA, while, more recently, King's EI method has been used increasingly in conjunction with the other two as an additional means for determining the existence of racial bloc voting. Id. at 1002- 03.

"Elections between white and minority candidates are the most probative in determining the existence of legally significant white bloc voting." Old Person v. Cooney, 230 F.3d 1113, 1123-24 (9th Cir. 2000). This is not to say that the Court should dismiss elections involving only white candidates; rather, it simply means that such elections are not necessarily entitled to the same evidentiary weight as those elections involving minority candidates. Rural W. Tenn. African-Am. Affairs Council v. Sundquist, 209 F.3d 835, 840 (6th Cir. 2000) (rejecting argument that elections involving only white candidates must be given the same weight as elections involving minority

---

[15] For instance, the City argued at trial that the government must show that the minority-preferred candidate regularly receives 70% or more of the minority vote before the Court can find that minority-voting patterns are cohesive. (Trial Tr. 1091-94) While the City acknowledges that no court has ever adopted a 70% floor *expressly*, it contends that the fact that courts have found races with over a 70% cohesion factor particularly probative impliedly imposes such a floor. A careful review of all of the cases upon which the City relies for this proposition, especially those in this Circuit, makes clear that no such hard and fast benchmark exists, however. (See Oral Ruling on City's Rule 52(c) Motion, Trial Tr., 1100-1104.)

candidates) ("Rural W. Tenn.").  This is because, "[w]hen white bloc voting is 'targeted' against

[minority] candidates, [minority] voters are denied an opportunity enjoyed by white voters, namely,

the opportunity to elect a candidate of their own race."  Clarke v. City of Cincinnati, 40 F.3d 807,

812 (6th Cir. 1994).  Put more succinctly, "the Voting Rights Act's guarantee of equal opportunity

is not met when '[c]andidates favored by blacks can win, but only if the candidates are white.'"

Rural W. Tenn., 209 F.3d at 840 (quoting Smith v. Clinton, 687 F. Supp. 1310, 1318 (E.D. Ark.

1988) (three-judge district court)).

 Targeting is the practical implementation of the general rule that elections involving minority

candidates are more probative.[16]  The actual inquiry is whether, when the minority-preferred

---

[16] Ruiz v. City of Santa Maria, 160 F.3d 543, 553 54 (9th Cir. 1998) ("[I]n a multi seat, multi vote election, the ability of the minority to elect a non minority candidate is not as probative in a Gingles prong three analysis as the inability of the minority to elect a minority candidate."); Uno v. City of Holyoke, 72 F.3d 973, 988 n.8 (1st Cir. 1995) ("Although the VRA does not require for a successful section 2 showing that minority-preferred candidates be members of the minority group, elections in which minority candidates run are often especially probative on the issue of racial bloc voting."); Nipper v. Smith, 39 F.3d 1494, 1540 (11th Cir. 1994) (en banc) (holding that elections involving only white candidates are generally less probative than those involving minority candidates); LULAC v. Clements, 999 F.2d 831, 849 (5th Cir. 1993) (en banc) ("LULAC") ("This court has consistently held that elections between white candidates are generally less probative in examining the success of minority-preferred candidates, generally on grounds that such elections do not provide minority voters with the choice of a minority candidate."); Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Ed., 4 F.3d 1103, 1128 (3d Cir. 1993) ("As a general matter, we believe that elections involving white candidates only are much less probative of racially polarized voting than elections involving both black and white candidates."); Black Political Task Force, 300 F. Supp. 2d at 304 ("After having conducted an exhaustive review of the case law and the circumstances of this litigation, we conclude that the most probative elections for our purposes are likely to be multi-race endogenous elections."); Bone Shirt, 461 F.3d at 1020-21 (8th Cir. 2006) ("Endogenous and interracial elections are the best indicators of whether the white majority usually defeats the minority candidate.") (footnote omitted); see also Gingles, 478 U.S. at 83 (White, J. concurring) (holding that disregarding race of victors "is interest-group politics rather than a rule hedging against racial discrimination"); id. at 101 (O'Connor, J., concurring in judgment) (agreeing with Justice White regarding the probative value of elections involving minority candidates).  But see Lewis v. Alamance County, 99 F.3d 600, 610 n.8 (4th Cir. 1996) (refusing to decide if elections involving only white

candidate is not white, the "white voting bloc coalesces to frustrate [minority] candidacies." Rural W. Tenn., 209 F.3d at 840.  Evidence of targeting can take a number of forms.  In Clarke, the Sixth Circuit looked for targeting based on the success rate of minority-preferred minority candidates versus minority-preferred white candidates.  40 F.3d at 811 (finding that targeting did not exist where the minority-preferred minority candidate prevailed over white opponents 47% of the time).  In Rural West Tennessee, the Sixth Circuit found targeting where white bloc voting increased substantially when the minority-preferred candidate was a minority.  Rural W. Tenn., 209 F.3d at 840 (finding targeting where white vote shares for the non-minority-preferred candidate went from 59% to 86% when the minority-preferred candidate was a minority).

### (i.)    Methodology

The government's expert, Dr. Handley, used the three techniques regularly employed by courts and concluded that legally significant racially polarized voting exists in Euclid.  In Gingles, the Supreme Court recognized that HPA and BERA were the then-standard methods in the academic literature.  478 U.S. at 53 n.20.  Subsequently, the judiciary and academia have regularly relied upon both HPA and BERA to analyze the existence of racially polarized voting.  See, e.g., Garza v. County of Los Angeles, 756 F. Supp. 1298, 1331-33 (C.D. Cal. 1990), aff'd, 918 F.2d 763 (9th Cir. 1990).  Recently, King's EI method has been used to supplement evidence derived from HPA and BERA.  Bone Shirt, 336 F. Supp. 2d at 1002-03; Christian Collet, *Bloc Voting, Polarization and the Panethnic Hypothesis: The Case of Little Saigon*, 67 J. POL. 907 (2005).  As Dr. Handley explained, while King's EI method is an improvement upon HPA and BERA, it does not replace these two traditional methods.  Instead, experienced political scientists use all three methods, not only to

---

candidates are deserving of less evidentiary value).

estimate voting behavior, but as a method for cross-checking the reliability of the estimates.  (See, e.g., Handley Test., Trial Tr. 278:6-10.)  She testified that, where the three methods do not agree, such as in the 2001 contest for Slot D, a prudent political scientist would conclude that reliable estimates were not possible.[17]  (Id. 148:25-149:3.)

**(ii.)   Euclid City Council Elections Involving African-American Candidates from 1995 to 2005**

Using the statistical techniques she outlined to analyze the eight most probative elections – the endogenous City Council elections involving African-American candidates – Dr. Handley concluded that racial bloc voting exists in Euclid.  (Id. 82:8-21, 97:22- 98:2.)  In seven of the eight contests, African-American voters and white voters supported different candidates.  (Id. 151:13-17.) In six of the eight elections, African-American voters strongly preferred the African-American candidate while white voters showed minimal support for the same candidate.  (See id. 102:23-109:12, 110:10-111:2, 113:2-22, 123:2-10.)  In those six contests, the average African-American support for the African-American-preferred African-American candidate was 76.4%,[18] whereas the average white support for the African-American-preferred African-American candidate was just 12.78%.  (Id.)  As a result, despite strong support from African-American voters, none of the African-American candidates prevailed.  (See Ex. 87.)

_____

[17] According to Dr. Handley, King's EI method improves upon BERA because King's EI method cannot produce out-of-bound estimates or estimates less than 0% or greater than 100%.  Out-of-bound estimates happen in BERA where the regression line is particularly steep. (Handley Test., Trial Tr. 114:1-14, 118:4-122:14.)  Out-of-bounds BERA estimates often occur when voting is highly polarized and, therefore, cannot be summarily rejected. (Id. at 102:7-22; 121:7-21.)

[18] According to Dr. Handley's estimates, in those six contests the African-American candidate received between 65.4% and 92.2% of the African American vote.  (See Handley Test. Trial Tr. 102:23-109:12, 110:10-111:2, 113:2-22, 123:2-10).

### (iii.) Euclid City Schools Board of Education Elections Involving African-American Candidates – 1999 to 2001

Dr. Handley also analyzed two recent Euclid City Schools Board of Education contests that included African-American candidates. (Handley Test., Trial Tr. 134:9-139:4.) These contests are probative of racial bloc voting because they occurred on the same day as City Council elections, involved the same citywide electorate, and featured African-American candidates. (Id. 98:19-99:2.) Based on the statistical evidence, Dr. Handley concluded that racial bloc voting occurred in both of these school board contests, with African-American voters supporting the African-American candidates and white voters supporting the white candidates. (Id. 138:25-139:4; Ex. 88.) The government also provided anecdotal evidence, in the form of candidate testimony, corroborating the statistical evidence of minimal support of African-American candidates among white voters. (Drake Test., Trial Tr. 895:14-896:4.)

### (iv.) Select Euclid Citywide Referenda

Dr. Handley further testified that recent citywide referenda provided evidence of racial bloc voting in Euclid. (Handley Test., Trial Tr. 139:5-25.) Two of these contests were the 2004 referenda on the proposed rezoning of the Hillandale property. (Id.) As discussed above, Providence Baptist Church's rezoning applications were controversial and characterized by racial overtones. (See Walton Test., Trial Tr. 442:5-15; Sustarsic Test., Trial Tr. 643:4- 645:10.) Dr. Handley also analyzed the 2005 mayoral retention election, which is relevant to the racial bloc voting analysis because the Mayor's role in settling a subsequent lawsuit filed by the Providence Baptist Church triggered the retention election. (Handley Test., Trial Tr. 139:5-25; City of Euclid's Answers to the United States' First Set of Requests for Admission, Ex. 122, No. 38.) The statistical evidence shows

23

that racial bloc voting occurred in the two defeated rezoning referenda: approximately 80% of African-American voters supported the rezoning referenda while 65% of white voters opposed the rezoning referenda.  (See Ex. 89.)  The mayoral retention election was not polarized, although an estimated 98.6% of African-American voters supported retaining the mayor. (Id.)  In short, the Court finds that African-American voters were cohesive in all three of the selected contests, and racial bloc voting occurred in two of these three contests. (See Handley Test., Trial Tr. 139:5-25.)

**(v.)     Euclid City Council Elections that Did Not Involve African-American Candidates – 1995 to 2005**

Finally, Dr. Handley analyzed the Euclid City Council elections since 1995 that did not include African-American candidates.  (Id. 100:7-10.)  The statistical evidence shows that of the twenty-six all-white contests for which African-American and white voter preferences could be determined, thirteen were polarized and thirteen were not polarized.  (Id. 150:17-23.) The African-American preferred candidate lost eleven of the thirteen all-white races that were racially polarized. (Id.)  When the councilmanic elections involving African-American candidates are included with these all-white elections, racial bloc voting occurred in twenty of the thirty-four contests for which reliable estimates could be derived.  (Id. 151:4-12.)

From Dr. Handley's analysis of Euclid's councilmanic elections, it is clear to the Court that the extent of racial bloc voting in Euclid is substantial.  When the African-American-preferred candidate is white, the average white bloc voting against that candidate is 52%, but when the African-American preferred candidate is African-American, average white bloc voting increases to 87%.  See Clarke, 40 F.3d at 816-17 (Boggs, J., concurring).  This significant change in white voting behavior is indicative of substantial racial polarization and also evidence of white voters targeting

24

African-American candidates.  See, e.g., Rural W. Tenn., 209 F.3d at 840 (targeting existed where "white voter cohesion in . . . increase[d] from 59% in white-white elections to 86% in black-white elections").

**(b)      Anecdotal Evidence of Racial Bloc Voting**

Though statistical analysis is the starting point for an assessment of racial bloc voting, the inquiry "does not stop with bare statistics." Whitfield v. Democratic Party of Ark., 890 F.2d 1423, 1428 (8th Cir. 1989); see, e.g., Rural W. Tenn., 209 F.3d at 844 (approving of anecdotal evidence of racial bloc voting); Askew v. City of Rome, 127 F.3d 1355, 1377 (11th Cir. 1997) (relying on both empirical and anecdotal evidence of racial bloc voting).  Anecdotal evidence relevant to the existence of racial bloc voting includes evidence of common political interests or racial attitudes held by members of the relevant groups in the jurisdiction.  See, e.g., Cottier v. City of Martin, 445 F.3d 1113, 1118-19 (8th Cir. 2006) (relying on testimony of political cohesion).

The statistical evidence of racial bloc voting in Euclid is corroborated by evidence of racial divisiveness within Euclid.  During the trial, the government provided the responses from two surveys within Euclid recently which can be interpreted as demonstrating a level of racial apprehension among Euclid's white voters.  Though it is unnecessary to recount those surveys in

detail here,[19] the Court found that the responses to questions about quality-of-life issues included complaints, of varying invective, about the growing African-American population and the perceived changes brought about by this population shift.[20]   The Court also heard testimony that these responses were similar to comments that various white candidates heard from voters while

---

[19] In 2005, as part of his campaign for council president, Edmund Gudenas circulated a survey that gauged issues of concern among Euclid's voters. (See Corbran Test., Trial Tr. 558:22-559:1.) The Gudenas survey asked questions such as "What needs to be done immediately to make Euclid better?" and "Any comments or suggestions regarding other issues, such as taxes, housing, business development, jobs, schools, or anything else." (Gudenas Campaign Materials – 2005 Blank City of Euclid Community survey, letter, and return envelope, Ex. 25.)  Despite the fact that none of the questions asked about race relations, many of the responses contained racially-charged statements about the City's African-American population. (See id.; Cervenik Test., Trial Tr. 313:5-347:25.) Of the over 600 surveys returned to Mr. Gudenas, there were approximately 115 comments about African-American youths, 60 comments that implicated race in a negative way, 55 "East Cleveland" or ghetto comparisons, and 70 complaints about rental properties and Section 8 housing. (Gudenas Campaign Materials – 2005 City of Euclid Community survey responses, Ex. 26.)

[20] In 2006, the Euclid City Service Evaluation Committee ("ECSEC") was formed by the Euclid City Council.  (Allen Test., Trial Tr. 1176:8-11.)  The purpose of the ECSEC is to gauge the satisfaction of Euclid's citizens with the responsiveness of city services. (Cervenik Test., Trial Tr. 349:16-23.)   As part of their mission, the ECSEC circulated surveys ("ECSEC surveys") throughout Euclid.  (Id. 349:24-350:11.)  Though the ECSEC survey mostly asked respondents to indicate their level of satisfaction with specific city services, a short section near the end asked what the respondent thinks will be the single biggest issue facing Euclid over the next several years. (Euclid Citizen Services Evaluation Committee survey, blank form, Ex. 32.)  Many of the ECSEC survey responses to that general inquiry reflect race-related concerns.  (See Cervenik Test., Trial Tr. 349:16-352:20.)

campaigning.[21]  Such comments ranged from complaints about African-American students to the use

of racial slurs.  The government also presented evidence tending to show subtle, but clear, appeals

to race by various candidates within their campaign literature and in their public discourse during

their candidacies. [2][2]

### (c)     Euclid's Arguments in Opposition

Rather than offer evidence contradicting the government's case supporting the second and

third Gingles preconditions, the City chose to attack the government's statistical methodology, to

attack the factual and legal standards it employed in reaching its conclusion that racial bloc voting

exists, and to offer two defenses that essentially blame African-American voters and African-

---

[21] In this regard, the experiences of one particular school board candidate, Howard Drake, were telling.  (Drake Test., Trial Tr. 895:14 – 930.)  Mr. Drake's experiences campaigning corroborate the statistical evidence of minimal support of African-American candidates among white voters. (Drake Test., Trial Tr. 895:14-896:4.)  As part of his campaign, Mr. Drake walked neighborhoods and attended candidate forums. (Id. 916:23-917:7, 919:2-17.) He put yard signs throughout the city, with a particular focus on high-traffic areas and near polling places.  (Id. 927:20-928:2.)  Mr. Drake sent out mailers in order to raise funds and to distribute his campaign literature.  (Id. 906:21-24, 914:18-21.)  He even followed the advice of other school board members and did not put his photograph on his campaign literature.  (Id. 939:12-940:5.)  Yet, on Election Day morning, he found that his signs had been removed or stolen while other candidates' signs had been left undisturbed or were newly planted.  (Id. 928:3-25.)  And while electioneering on Election Day, he encountered a number of white voters who took his campaign materials, crumpled them up, and threw them at his feet.  (Id. 929:15-930:5.)  Mr. Drake had the advantage of incumbency, but even that was insufficient to overcome racial bloc voting in an at-large election; he ran last among white voters, approximately 11 percentage points behind the second place white candidate who was elected.

[22] On June 17, 2001, for example, a council member introduced legislation remarking that it was "an opportunity to do something that could attract individuals, young yuppies, white people that the City wants to bring in here."  Candidates also testified that they heard remarks from residents reflecting apprehension about Euclid's growing African-American population while campaigning throughout Euclid's neighborhoods.  (See McTighe Test., Trial Tr. 498:7-15; 504:4-505:6).

American candidates for their inability to elect African-American preferred African-American candidates.  The Court found none of the strategies to be availing.

### (i.) The Reliability of the Government's Statistical Methodologies

As noted above, since Gingles, the two most widely accepted methods for producing statistical evidence of racial bloc voting have been BERA and HPA.  Gingles, 478 U.S. at 53 n.20. Recently, a third method, King's EI method, has emerged as an accepted method for producing statistical evidence of racial bloc voting.  See, e.g., Bone Shirt, 336 F. Supp. 2d at 1002-03.  The City's expert, Dr. Zax testified that Dr. Handley's application of BERA, HPA, and King's EI, under the circumstances of this case, did not yield reliable results in many instances.  Dr. Zax, however, admitted that he did no independent analysis of election results; he offered no alternate or superior method of statistical or election analysis.  Instead, Dr. Zax's testimony was largely limited to criticisms of the *methodologies* employed by Dr. Handley.

After careful consideration of all of the expert testimony, the Court is not persuaded that Dr. Zax's criticisms of Dr. Handley's analysis justify disregarding her conclusions.  First, numerous courts, including Gingles itself, have accepted statistical analyses employing the BERA and HPA formulations Dr. Zax finds so flawed, regularly concluding that they constitute reliable probative evidence of racial bloc voting.

Second, Dr. Zax's criticisms were overly general.  Importantly, he was unable to identify with any specificity the extent to which the estimates produced by the three methodologies used by Dr. Handley were affected by the weaknesses he identified in each approach.  While he noted the need to assess margins of error for Handley's calculations, for instance, he could not quantify what those

28

margins of error should be.

Third, while some of Dr. Zax's criticisms of BERA and HPA appear well-taken, they were not ignored by Dr. Handley.  Indeed, Dr. Handley testified that King's EI is an important methodology to employ in a racial bloc voting analysis because it both was designed to, and does, address some of the weaknesses in BERA – particularly the need to avoid certain illogical results that sometimes flow from resort to BERA's double regression analyses.  Dr. Handley accounted for the weaknesses in BERA, however, and guarded against results in which the Court could have little confidence by employing all three methodologies and providing points of comparison between them for the Court to consider.  Thus, Dr. Handley examined the relevant races using HPA, BRA and EI, used each of these tests as a check upon the others, and only drew conclusions as to races where all three methodologies were in general agreement.

In the absence of any countervailing statistical evidence proffered by Dr. Zax, or any other witness for the City, the Court finds that Dr. Handley's use of all three methodologies and her careful comparisons thereof are more than sufficient to support her conclusions with respect to both cohesion and polarization. [23]

Finally, even if the Court accepted Dr. Zax's statement that Dr. Handley's results were *scientifically* questionable, it does not necessarily follow that those results were entirely irrelevant. [24]

---

[23] It is relatively easy to launch attacks on statistical methodologies.  None appear perfectly tailored to account for every possible variable in the population or event being measured.  The Court is comforted both that the academic literature contains evidence of efforts to refine the analysis employed in these cases and by Dr. Handley's approach of comparing all relevant methodologies.  Myopic insistence on one as the most perfect methodology simply seems unrealistic.

[24] Other courts have similarly rejected Dr. Zax's criticisms of BERA.  See Bone Shirt, 336 F. Supp. 2d at 1002-03; Old Person v. Brown, 182 F. Supp. 2d 1002, 1012 (D. Mont. 2002).

In other words, an approach might yield an inexact result for purposes of a hypothetical mathematical challenge, but could still be correlative, probative, and sufficiently accurate to bear on the ultimate issue of racial bloc voting.  The standard of proof here is preponderance, not mathematical certainty.  Again, as noted above, the Court is to employ statistical analysis in aid of its own fact-finding, not to adhere slavishly to it. [5]2

### (ii.)    The Reliability of the Government's Conclusions with Respect to Racial Bloc Voting

As noted, Dr. Zax challenged both Dr. Handley's methodology and her conclusions with respect to racial bloc voting in Euclid.  As to the latter, Dr. Zax opined that Dr. Handley's conclusions were flawed, not just because of her methodological weaknesses, but because he asserts she also employed an incorrect standard by which to measure her conclusions.  Dr. Zax, employing what he said is the correct measure of racial bloc voting, opined that, even if one accepts Dr. Handley's statistical measures of the voting patterns in Euclid, those statistics do not support the conclusion that racial bloc voting historically has occurred there to any meaningful degree.  Specifically, he concludes that – again, even using Dr. Handley's statistical measures – only four of the twenty-four races analyzed were racially polarized.

To support his conclusion, Dr. Zax created a bright-line test in which he opined that an election can only be deemed polarized where white voters and minority voters each supported opposing candidates at a level greater than 60%.  Such bright-line tests for cohesion, however, have been largely rejected.  <u>Lewis</u>, 99 F.3d at 613 (conducting an "individualized determination" of

---

[25] The Court also rejects Dr. Zax's contention that King's EI methodology is unreliable in election contests involving more than two candidates.  The Court credits Dr. Handley's testimony on this point and finds that the academic literature, Dr. King's own comments, and an analysis of his E2I software, support the conclusion that it is appropriate to employ King's EI methodology to assess voting behavior in multi-candidate and multi-seat elections.

whether a candidate is preferred rather than a bright line number that "automatically" makes a candidate preferred) (citing Collins II, 883 F.2d at 1240-41); see also Bone Shirt, 461 F.3d at 1027 (Gruender, J. concurring in judgment) (criticizing Dr. Zax for conflating cohesion and bloc voting by requiring 60% of white voters to support a non-minority-preferred candidate); cf. NAACP v. City of Niagara Falls, 65 F.3d 1002, 1018 n.18 (2d Cir. 1995).  Dr. Handley's test – whether minority voters and white voters would elect different sets of candidates if each voted separately – is more clearly in line with existing Section 2 jurisprudence.  See Gingles, 478 U.S. at 53 n.21; see also Brown v. Bd. of Comm'rs of City of Chattanooga, 722 F. Supp. 380 (E.D. Tenn. 1989) (labeling races as either "racially polarized" or "not racially polarized;" deeming contests as "racially polarized" where African-American support was as low as 37.5%).  Dr. Zax, moreover, failed to distinguish, or to emphasize adequately the importance of, the differing results between elections involving minority candidates and those involving only white candidates.  See Ruiz, 160 F.3d at 553-54 ("[I]n a multi seat, multi vote election, the ability of the minority to elect a non-minority candidate is not as probative in a Gingles prong three analysis as the inability of the minority to elect a minority

candidate.").[26]  The Court, therefore, finds Dr. Handley's conclusions that the election results in Euclid demonstrate that the minority group is politically cohesive and that the white majority votes sufficiently as a bloc usually to defeat the minority's preferred candidate to be better grounded both in law and fact.

### (iii.)        *The City's Causation Defenses*

Finally, as discussed at some length in its oral ruling, the Court rejects the City's arguments that lay the blame for the failure to elect an African-American candidate at the feet of the African-American electorate and the African-American candidates in Euclid.[27]

As to the electorate itself, the City claims apathy among African-American voters is the real cause of the historical failure to elect African-American candidates to city-wide offices.  Low voter

---

[26] The City went even further than Dr. Zax on these points.  Not only did the City suggest that the Court *not* give greater evidentiary weight to races involving minority candidates (on grounds that the substantial authority suggesting that the Court do so is not consistent with Gingles itself) the City also suggested that this Court must impose an 80% statistical floor as a prerequisite to a finding of racial polarization.  The City argued that this prerequisite arises from a concurrence by Chief Judge Daniel J. Boggs in Clark, and that this Court is bound to impose it.  The Court addressed these arguments at some length in its oral ruling on the City's Rule 52(c) motion made at the close of the government's case in chief.  (Trial Tr., at 1100-1104.)  The Court does not repeat its ruling here, but incorporates it by reference.  In summary, based on the authority mentioned earlier in this Order, the Court rejected the contention that the races with minority candidates not be given greater (albeit not exclusive) evidentiary weight.  Based on a careful reading of Judge Boggs's concurrence in Clark, the statistics and authorities therein, and remaining relevant authority on this issue, the Court also rejected the suggestion of an 80% floor (or even one close to it) as an immutable legal standard in a racial polarization inquiry.

[27] Notably, several Circuit Courts of Appeals have held that the, "inquiry into the cause of white bloc voting is not relevant to a consideration of the Gingles preconditions."  Goosby, 180 F.3d at 491 (citing Lewis, 99 F.3d at 615 n.12); Clarke, 40 F.3d at 813 n.2 ("[W]e need not consider whether a showing that the minority-preferred candidates' lack of success is 'somehow tied to race,' is a prerequisite to a finding of 'legally significant white bloc voting.'") (quotations omitted).

turnout on the part of members of a minority does not militate against finding a Section 2 violation, however.  Instead, "low voter turnout has often been considered *the result* of the minority's inability to effectively participate in the political process."  Harvell v. Blytheville Sch. Dist. No. 5, 71 F.3d 1382, 1388 (8th Cir. 1995) (emphasis added).  The fact of disenfranchisement, of a feeling that one's vote would be meaningless if exercised, often follows from, and is itself caused by, vote dilution.  See e.g., United States v. Blaine County, 363 F.3d 897, 911 (9th Cir. 2004) (describing the situation where low voter turnout could defeat a Section 2 claim as a "vicious cycle").  The City's argument turns the appropriate inquiry on its head.

Even if relevant, moreover, the City offered little more than speculation regarding the effects of African-American voter turnout on the results of councilmanic elections.  See Harvell, 71 F.3d at 1387 ("Speculation regarding reasons for low minority turnout is inappropriate.").  Indeed, it was the government's evidence on this point which was most telling, indicating that turnout was not the relevant inquiry. [8][2]

Similarly, with respect to Euclid's argument that African-American candidates have not been elected because of their qualifications, or the quality of their campaigns, the City has offered no case law supporting the notion that it is even appropriate for a court to inquire into those areas.  Ruiz, 160 F.3d at 558 (stating, it "would be a disservice to both the individual candidates and the goals of the Voting Rights Act for federal courts, years after an election, to scrutinize the qualifications of minority candidates who run for public office in jurisdictions with historically white-only officeholders.")  The issue before the Court is not who ran a better campaign, or who this Court

---

[28] Dr. Handley's analysis showed that, if one were to assume similar turnout rates among African-American and white voters, African-Americans would lose because of white bloc voting, not turnout numbers.  (Handley Test., Trial Tr. 1368:19 – 1269:12, 1372:5 – 1373:9; Turnout Chart, Ex. 130.)

objectively believes deserved to win a particular race, but who voters would have elected if given a fair and equal opportunity to participate in the political process.  Avoiding the kind of second-guessing the City invites on this point is particularly important when one recognizes that the quality of any given campaign turns on many of the same factors that would justify a conclusion that vote dilution exists – access to a slating process, access to campaign funds (which could be impacted by socioeconomic factors, cross-pollinization of fundraising by candidates, perceptions of likely ability to win, etc.) and access to experienced campaign personnel.

On this point, moreover, the Court specifically finds that the evidence adduced at trial did not demonstrate the disparity between the quality of minority campaigns (or candidates) and those of whites which the City depicted in its briefing and described in its argument.

### B.    The Totality of the Circumstances

Having found that the government has established the Gingles preconditions by a preponderance of the evidence, the Court proceeds to an analysis of the totality of the circumstances. "[I]t is the rare case for minority plaintiffs to satisfy the Gingles' preconditions and fail to overcome defendants' evidence that other factors rebut that initial proof." Sanchez, 97 F.3d at 1322.  As noted above, there is no requirement that any particular number of Senate Factors be proved; instead "the question [of] whether the political processes are 'equally open' depends upon a searching practical evaluation of the 'past and present reality,' and on a 'functional' view of the political process." Gingles, 478 U.S. at 45 (citation omitted).  The Gingles Court found that the second and seventh Senate Factors are the most important Senate Factors in a vote dilution case.  478 U.S. at 48 n.15. The remaining Senate Factors "are supportive of, but *not essential to*, a minority voter's claim."  Id.

34

### 1.    Senate Factor One – History of Official Discrimination

The first Senate Factor considers whether there has been a showing of a history of official discrimination that "touched" a minority group's voting rights or otherwise affected their ability to participate in the democratic process. Gingles, 478 U.S. at 37 (quoting S. Rep. No. 97-417 at 28-29). At trial, the government showed both that Euclid has a history of discrimination in the areas of housing and education and that its history in those areas has resulted in depressed political participation among African-Americans.

In 1976, the United States Department of Housing and Urban Development ("HUD") informed city officials that Euclid was not in compliance with Title 8 of the 1968 Civil Rights Act, which prohibited racial discrimination in the sale or rental of housing units; it also failed to comply with Executive Order 11063 (1963), which prohibited discrimination in new housing constructed using federal mortgage guarantees or subsidies, and with Section 570.900(c) of the Community Development Block Grant ("CDBG") regulations, requiring jurisdictions receiving CDBG funds to engage in affirmative efforts to promote fair housing opportunities. (Sugrue Test., Trial Tr. 993:20-994:24; John Riordan to Tony Sustarsic, Jan. 6, 1976, Ex. 56.) City officials failed to take action in response to the HUD charges. (Sugrue Test., Trial Tr. 994:25-995:21, 996:24-999:1; see City Council Executive Committee Minutes, May 24, 1974, Ex. 2031.) For a time, the City's failure to comply with its fair housing obligations caused HUD to freeze the City's CDBG funds. (Comiskey Test., Trial Tr. 806:21-807:8; Citizens Coal. for Block Grant Compliance v. City of Euclid, Complaint, Civ. A. No. C78-1168 (N.D. Ohio 1978), Ex. 113.) Reflecting the concerns expressed by HUD officials, private organizations filed a lawsuit against the City for its failure to comply with the fair housing requirements of federal law. (Sugrue Test., Trial Tr. 999:2-20; see City Council

35

Executive Committee Minutes, May 24, 1974, Ex. 2031.)  The parties reached a settlement agreement in 1981, pursuant to which the City retained the Cuyahoga Plan of Ohio, a fair housing group, to investigate unfair real estate practices in Euclid.  (Sugrue Test., Trial Tr. 999:2-20.)

A key investigatory tool used by the Cuyahoga Plan during the 1980s was the audit, a testing procedure in which one African-American person and one white person separately applied to rent or purchase property.  (See Comiskey Test., Trial Tr. 784:2-20.)  Audit testing revealed that Euclid continued to experience a significant level of racial "steering," that is, directing potential African-American home buyers or tenants to predominantly African-American or mixed neighborhoods – usually on the south side – and only directing whites to predominantly white neighborhoods – usually north of the freeway.  (Sugrue Test., Trial Tr. 999:21-1001:20; Clarence Bolden to Kory Koran, Sept. 15, 1988, Ex. 60.)  Problems of racial steering continued through the 1990s and even to the present.  (See Cervenik Test., Trial Tr. 303:11-304:13; Rudolph v. Smythe Cramer Co., First Amended Complaint, Civ. A. No. 06-3031 (N.D. Ohio Mar. 1, 2007), Ex. 126.)

Charles Comiskey, the city government employee charged with overseeing the fair housing issue, informed his superiors that racial steering was a major problem in Euclid, and that steering contributed to the residential segregation of African-Americans and whites in Euclid.  (Sugrue Test., Trial Tr. 1000:21-1003:4; Chuck Comiskey to Kory Koran, Nov. 20, 1989, Ex. 61.)  Other city officials testified at trial that fair housing efforts were poorly funded and impotent.  During the 1980s fair housing groups such as Euclid Community Concerns often complained about racial discrimination and the city's failure to deal with the issue.  (Sugrue Test., Trial Tr. 1002:9-16.)  In addition, many citizens and city officials complained about "block-busting," that is, efforts of realtors to urge white homeowners in a particular area of the City to sell their property quickly –

perhaps even at a loss – because African-Americans were moving into the neighborhood.  (Comiskey Test., Trial Tr. 766:12-20, 767:3-12; Sugrue Test., Trial Tr. 1000:7-14, 1002:9-1004:4.)

Not until 1992, later than many other communities in the Cleveland metropolitan area, did Euclid adopt a fair housing ordinance.  The ordinance created a community relations office, which was given authority to conduct administrative hearings on fair housing complaints and to refer meritorious complaints to the City's law department for possible litigation.  The City never funded or staffed this office sufficiently, however, and no administrative hearings were ever held, nor was fair housing litigation ever undertaken by the City.  The City essentially delegated enforcement of the ordinance to a local fair housing advocacy group, Euclid Community Concerns, and funded its activities at a minimal level, using only a portion of the City's CDBG revenue. Euclid Community Concerns was a small, mostly volunteer organization, that was never provided sufficient funds or staff.

The government's expert historian, Dr. Thomas Sugrue, applied the standard statistical measure of residential segregation, the index of dissimilarity, to official census data for Euclid at the block level for 1990 and 2000.  This index measures the percentage of a racial group – in this case African-Americans – that would have to move in order for African-Americans and whites to be distributed evenly across the City.  (Id. 984:6-21.)  An index of zero would indicate complete racial integration – the African-American percentage would be the same in every census block – whereas an index of 100 signifies complete racial segregation.  (Id.)  For 1990 Euclid's index of dissimilarity was 60.7, and for 2000 its index was 57.7, indicating that Euclid has been and remains a racially segregated community.  (Id. 984:23-985:3.)  Dr. Sugrue also testified that, from at least the 1980s through the present, there has been wide disparity in home ownership rates between whites and

African-Americans in Euclid.  This racial segregation has resulted in disproportionate concentration of African-Americans in neighborhoods immediately adjoining Euclid Avenue, on the south side of the City.  (DIS Maps, Ex 81 and 82, depicting Black, Non-Hispanic population as disclosed by 1990 and 2000 Census data, respectively.)

Racial segregation in the area of housing resulted in racial segregation in the City's public school system.  School attendance zones tended to coincide with the north/south division in Euclid, so that the neighborhoods in which African-Americans were concentrated attracted disproportionate numbers of African-American pupils.  (Sugrue Test., Trial Tr. 1010:16-1011:7.)  In 1986 the Ohio Department of Education wrote a letter to the Euclid School District, identifying a pattern of what it called "racial isolation" in certain city schools that were predominantly white or predominantly African-American and calling on the City to reduce the racial isolation.  (Id. 1011:16-1013:21; Letter from Robert Moore to James Wilkens, Apr. 1, 1986, Ex. 77.)  The State also criticized the school system's practice of permitting white students assigned to other schools to transfer to predominantly white schools.  (Id.; Letter from Robert Moore to James Wilkens, Apr. 1, 1986, Ex. 77.)  In 1974, the school district signed a consent decree with the United States Department of Justice wherein it agreed to implement an affirmative action hiring program – this was also a problem identified by the State.  (Sugrue Test., Trial Tr. 1013:22 1016:9.)

### 2.    Senate Factor Two – Racial Polarization

Through Dr. Handley's testimony and corroborating anecdotal evidence, the United States proved by a preponderance of the evidence that voting in Euclid is racially polarized.  Gingles, 478 U.S. at 37 (quoting S. Rep. No. 97-417 at 28-29).  Not only has an African-American never won a councilmanic election in Euclid, but in all but one election since 1995 the African-American

candidate received the fewest number of votes.  The Court finds that the statistical evidence shows that racial bloc voting occurred in seven of the eight elections since 1995 involving African-American candidates.  (Handley Test., Trial Tr. 151:13-17.)  The extent of racial bloc voting against the African-American-preferred candidate went from 52% when that candidate was white to 87% when that candidate was African-American.

There is also substantial anecdotal evidence of white bloc voting, moreover.  As discussed above, recent surveys taken within Euclid elicited a substantial number of racially charged responses.  (See infra section IV(A)(2)(b); Gudenas Campaign Materials – 2005 City of Euclid Community survey responses, Ex. 26; Euclid Citizen Services Evaluation Committee survey responses, Ex. 33.) Numerous candidates (both white and African-American) also testified that they were confronted by white voters who complained of the growing African-American population.

### 3.        Senate Factor Three – Enhancing Mechanisms

The third Senate Factor assesses whether there is evidence of voting procedures in place that may enhance vote dilution.  Gingles, 478 U.S. at 37 (quoting S. Rep. No. 97-417 at 28-29).  Simply stated, a numbered post system, like Euclid's slotted-at-large system, is a textbook enhancing factor in at-large elections because it deprives minority voters of the opportunity to elect a candidate by "single-shot" voting (i.e., of concentrating all of its votes on a single candidate).  See, e.g., City of Rome v. United States, 446 U.S. 156, 184 n.19, 185 n.21 (1980).  Euclid's numbered post system not only "enhances the discriminatory effect of at-large elections by limiting the ability of minority voters to single-shot vote," (Handley Test., Trial Tr. 137:1-4), but it has also helped to concentrate six of Euclid's nine council members into the same, predominantly white, ward.  (Sustarsic Test., Trial Tr. 661:23-663:4, 669:5-20).

39

On this issue, there was testimony at trial that the slotting system was put in place in the 1990's for non-discriminatory reasons. Specifically, testimony at trial indicated that the slotting system was designed to undercut the virtual guarantee of incumbent reelection which seemed to exist under the old election system, and to generate greater city-wide debate during councilmanic elections. Even accepting this evidence as true, however, it is irrelevant. This Senate Factor directs the Court to inquire into the existence and effect of a slotting system, not its purpose. The Court easily concludes that a slot system for councilmanic elections does exist, and that it does have an enhancing discriminatory effect with respect to African-American participation in councilmanic elections, regardless of the espoused benign reasons for its adoption.

### 4.       Senate Factor Four – Candidate Slating

The fourth Senate Factor considers whether members of a minority group have been denied access to a candidate slating process. Gingles, 478 U.S. at 37 (quoting S. Rep. No. 97-417 at 28-29). Slating is "a process in which some influential non-governmental organization selects and endorses a group or 'slate' of candidates, rendering the election little more than a stamp of approval for the candidates selected." Westwego Citizens for Better Gov't v. City of Westwego, 946 F.2d 1109, 1116 n.5 (5th Cir. 1991) (citing Overton v. City of Austin, 871 F.2d 529, 534 (5th Cir. 1989)). A slating organization can either be an official political party or an unofficial nonpartisan organization. Compare New Rochelle Voter Defense Fund v. City of New Rochelle, 308 F. Supp. 2d 152, 160-61 (S.D.N.Y. 2003) with Perez v. Pasadena Indep. Sch. Dist., 958 F. Supp. 1196, 1123-24 (S.D. Tex. 1997), aff'd, 165 F.3d at 368. A nonpartisan or unofficial slating group, such as the Euclid Taxpayer Alliance, is "an organization whose purpose is to recruit candidates, nominate them, and campaign for their election to office in a nonpartisan election system." Citizens for a Better Gretna v. City of

40

Gretna, 636 F. Supp. 1113, 1122-23 (E.D. La. 1986) (quotation omitted).  The slating process need not be formalized.  See, e.g., Harper v. City of Chicago Heights, Nos. 87 C 5112, 88 C 9800, 1997 WL 102543 at *9 (N.D. Ill. Mar 5, 1997); Gretna, 636 F. Supp. at 1123.  The salient question for purposes of Senate Factor Four is, "where there is an influential official or unofficial slating organization, [what is] the ability of minorities to participate in that slating organization and to receive its endorsement?"  Marengo County Comm'n, 731 F.2d at 1569.

All parties agree that, between 1937 and 1987, Euclid city government effectively was controlled by "the Euclid Independent Coalition" (the "Coalition).  (Corbran Test., Trial Tr. 539:10-24.)  The Coalition had a formal process whereby candidates were interviewed by leaders of the organization. (Dallos Test., Trial Tr. 863:14-20.)  Candidates endorsed by the Coalition used brown and orange colored campaign material to indicate their membership in the slate.  (Id. 863:3-13.)  The Coalition candidates were virtually assured election.  In one instance, the Coalition was associated with a campaign flier entitled, "The Many Faces of Joe."  (Euclid Independent Coalition Campaign Materials – 1979 "Many Faces of Joe" flier, Ex. 18.)  As discussed below, the "Many Faces of Joe" flier used terms associated with racial issues, including "fair housing" and "busing."  (Id.; Cervenik Test., Trial Tr. 298:18-299:7.)  The Coalition also opposed the 1986 desegregation order from the Ohio Department of Education.  (See Sugrue Test., Trial Tr. 1016:10-1020:21.)  No African-American candidate was ever endorsed by the Coalition. (Cervenik Test., Trial Tr. 299:17-19.)  The Coalition effectively ended in 1987 with the election of independent mayoral candidate David Lynch.  (Corbran Test., Trial Tr. 539:10-24.)

Slates returned to Euclid politics in 2001, with the formation of the Euclid Taxpayer Alliance in response to action taken by the City Council. (Id. 540:1-542:9; City of Euclid's Answers to the

United States' First Set of Requests for Admission, Ex. 122 Nos. 25-26.)  In its first year, the Taxpayer Alliance slate succeeded in electing four of its five endorsed candidates.  None of the candidates endorsed by the Euclid Taxpayer Alliance was African-American, nor did the Euclid Taxpayer Alliance invite any of the two declared African-American candidates to join the slate. (Cervenik Test., Trial Tr. 301:8-11, Corbran Test., Trial Tr. 542:16-20.)  In 2003, the Euclid Taxpayer Alliance faced an opposition slate called the Euclid Good Government PAC ("EGG"). (Cervenik Test., Trial Tr. 301:18-23.)  Of the ten candidates endorsed by EGG, Jenice R. "Jai" Walton, the first African-American candidate ever endorsed by a Euclid slate, was among the three who lost.  (Cervenik Test., Trial Tr. 302:1-16.)  The remaining three successful candidates were all members of the Euclid Taxpayer Alliance slate.  (Id.)  Both slates remained active in the 2005 City Council election.  There were no African-American candidates in that election.

Slates retain significant political influence in Euclid: since 2001, only one candidate has been able to defeat candidates endorsed by one of the two slates.  The slating process aids candidates in many ways, resulting in cross-pollinization among candidates with respect to endorsements, donations, and marketing, and permits endorsed candidates to reach a greater number of potential voters in the campaign process at far less cost.  Accordingly, the Court finds there is a slating process that is very effective in the City of Euclid and that it has until the present essentially excluded minority candidates.

### 5.    Senate Factor Five – Socio-Economic Disparity

The fifth Senate Factor questions whether the minority group bears the effects of discrimination, in areas such as education, employment, and health, which hinders its ability to participate effectively in the political process. Gingles, 478 U.S. at 37 (quoting S. Rep. No. 97- 417

at 28-29).  Socioeconomic "disparities are the effects of discrimination to which the Senate Factor refers."  Bone Shirt, 336 F. Supp. 2d at 1038.  In Euclid, there are significant racial disparities in the educational levels of African-American and white residents, as reflected in data from the U.S. Census of 2000. (Sugrue Test., Trial Tr. 1024:19-1025:8; Table 4: Educational Attainment By Race, Euclid, 2000, Ex. 69.).  As Dr. Sugrue explained, the social science literature on voter participation makes clear that educational achievement is strongly and directly correlated with voter registration and turnout. (Sugrue Test., Trial Tr. 1024:19-1025:8.)

Other socio-economic characteristics are also correlated with political participation.  These indicators also display disparities between African-Americans and whites in Euclid.  According to the 2000 Census, 6% of African-Americans in Euclid are unemployed, as compared with only 4% of whites.  (Id. 1027:17-1029:8; Table 9: Socio-Economic Status by Race, Euclid, 2000, Ex. 74.) Sixteen percent of African-Americans live below the poverty line, but only 7% of whites.  (Id.) Median family income for African-Americans is $37,421, but $49,476 for whites. (Id.)  Per capita income is $17,711.00 for African-Americans but $20,896.00 for whites.  (Id.) Social scientists analyzing the relationship between socioeconomic characteristics and political participation agree that racial disparities in socioeconomic characteristics are correlated with significantly lower levels of voter registration and turnout among African-Americans, as compared with whites. (Sugrue Test., Trial Tr. 1029:9-1030:11.)  This is borne out by the disparity in turnout by race, where the white

43

turnout rate in City Council elections over the last decade has often been triple the turnout among African-Americans.  (Handley Test., Trial Tr. 152:15-16; Ex. 90.) [9][2]

### 6.        Senate Factor Six – Overt or Subtle Racial Appeals

The sixth Senate Factor inquires into whether Euclid's elections have been characterized by overt or subtle racial appeals.  Gingles, 478 U.S. at 37 (quoting S. Rep. No. 97-417 at 28-29). Racial appeals can take a variety of forms, from the use of racially-charged campaign issues, Williams v. City of Dallas, 734 F. Supp. 1317, 1348 (N.D. Tex. 1990), to candidates using photographs of their African-American opponents on their campaign literature, McDaniels v. Mehfoud, 702 F. Supp. 588, 595 (E.D. Va. 1988).  The use of racially-charged campaign issues, such as campaign literature that preys on racial anxiety, is a well-recognized form of racial appeal.  See, e.g., Goosby, 956 F. Supp. at 342 (finding Senate Factor six established where campaign literature preyed on fears that African-American students would be bused to town schools and warned of urban encroachment from New York City).

As discussed above, the government has presented evidence indicating that two pieces of campaign literature, put out twenty (20) years apart, contained racial subtexts.  Indeed, in the earlier instance, the "subtext" was far from subtle.  While it is not necessary to prove that racial appeals are a permanent or exceedingly pervasive feature of a jurisdiction's elections, see, e.g., Bone Shirt, 336

---

[29] Dr. Sugrue did note that, other than the statistics regarding the housing disparity – which he found significantly more imbalanced than in other communities – the other factors relating to disparities in work status, income levels and educational attainment in Euclid mirrored that in other similarly-situated United States cities.  (See Sugrue Test. Trial Tr. 1024:19-1029:8.)  That this may be true, however, does not alter the importance of this Senate Factor to the Court's analysis.  Substantial sociological, political and academic support exists for the conclusion that all of these factors impact participation in the political process and that, in combination with the other considerations described in the Senate Factors (i.e., as part of the totality of the circumstances), are indicative of vote dilution.  (Id.)

F. Supp. 2d at 1041 (finding racial appeals based mostly on two newspaper articles, in 1978 and 2002, focusing on allegations of voter fraud by Native Americans); United States v. Alamosa County., 306 F. Supp. 2d 1016, 1025-26 (D. Colo. 2004) (finding racial appeals based on three elections where candidates identified own ethnicity), the evidence in this case refers to two disparate pieces of literature, from different sources, put out decades apart.  As such, although the evidence proffered in support of Senate Factor Six is an appropriate part of the Court's consideration of the totality of the circumstances, the Court did not find it particularly compelling, and does not find that it evidences an overall flavor of racial appeals or racial pandering in Euclid's election campaigns or among the City's candidates. [30]

### 7. Senate Factor Seven – Success Rate of African-American Candidates

The seventh Senate Factor, the extent to which members of the minority group have been elected to public office in the jurisdiction, is the only Senate Factor expressly referenced by Congress in the statutory language of Section 2.  Gingles, 478 U.S. at 37 (quoting S. Rep. No. 97-417 at 28-29).  In Euclid, despite several attempts, before the revisions to the election process put into place by the remedial order in this case, no African-American candidate has ever been elected to Euclid's City Council or any other city-wide office.  (See City of Euclid's Answers to the United States' First Set of Requests for Admission, Ex. 122 No. 6.)

### 8. Additional Factor – Unresponsiveness

While not identified as a separate factor, a significant lack of responsiveness on the part of elected officials to the particularized needs of the African-American community is probative in establishing a Section 2 violation.  S. Rep. 417 at 29; see also Davis v. Bandemer, 478 U.S. 109, 131

---

[30] Despite the government's contention to the contrary, the Court is not persuaded that a candidate's own identification of his or her ethnic background constitutes a racial appeal.

(1986); Cousin, 145 F.3d, at 833.  The United States has provided substantial testimony and evidence regarding fair housing issues, reluctance or untimely responses of elected officials to housing problems, the absence of minority participation in employment in the City of Euclid, and other complaints by minorities in the City, which are meaningful in the totality of the circumstances.

To date, Euclid's work force, including its safety services, remains overwhelmingly white, despite the fact that African-Americans represent over 30% of the City's population.  As late as 1975 the only African-Americans employed by the City were in the Solid Waste Division, a unit that was not only all-black, but consigned to locker and toilet facilities which were both racially segregated and sub-standard.  (Sugrue Test., Trial Tr. 1088:5-1089:11; In re City of Euclid, OH, Report of the Hearing Examiner, No. 318 (Ohio Civil Rights Comm. July 8, 1975), Ex. 109 25-26, 56, 74-75.)

The City has also failed to protect African-Americans from housing discrimination. Throughout the 1970s and 1980s, the City was in conflict with the Federal government and local community interest groups over its failure to comply with Federal fair housing laws.  (Sugrue Test., Trial Tr. 993:20-995:21, 996:24-1001:20; John Riordan to Tony Sustarsic, Jan. 6, 1976, Ex. 56; Settlement Agreement, Nov. 25, 1981, CDBG Litigation, Ex. 59; City Council Executive Committee Minutes, May 24, 1974, Ex. 2031.)  Though City officials were aware of the housing problems, they failed to pursue corrective measures.  (Holzheimer-Gail Test., Trial Tr. 840:8-841:3; Dallos Test., Trial Tr. 865:23-866:4, 867:5-867:10; Johnson Test., Trial Tr. 880:20-881:19; Drake Test., Trial Tr. 937:1-938:7; Euclid Community Concerns, Proposal to the City of Euclid, Community Development Block Grant Program, FY 1995, Ex. 49.)  At various times, the City's failure to meet its fair housing obligations caused HUD to freeze its CDBG funds.  (Comiskey Test., Trial Tr. 806:21-807:8; Citizens Coal. for Block Grant Compliance v. City of Euclid, Complaint, Civ. A. No. C78-1168

46

(N.D. Ohio 1978), Ex. 113 12.)  In brief, the Court finds that the government produced convincing evidence that, on at least certain issues, the City of Euclid historically has been unresponsive to the needs of its African-American community. [31]

### 9.    Additional Factor – Lack of Proportionality

Courts should also consider, in the totality of the circumstances, whether minority voters form effective voting majorities in a number of legislative districts that are roughly proportionate to their respective shares in the voting age population.  <u>DeGrandy</u>, 512 U.S. at 1014 n.11; <u>see also</u> <u>Rural W. Tenn.</u>, 209 F.3d at 842.  As of the 2000 census, Euclid's African-American voting age population is 27.8%, yet none of Euclid's four wards have a majority of African-Americans of voting age.  (Handley Test., Trial Tr. 85:16-23, 88:5-22.)  In order to arrive at rough proportionality, African-Americans should form an effective voting majority in two of the eight council seats.  The Sixth Circuit has stated that when the lack of proportionality is present along with racial bloc voting and the failure to elect minorities, these three factors "simply overwhelm those factors that might favor" the defense.  <u>Rural W. Tenn.</u>, 209 F.3d at 844.  Thus, this uncontested fact, in combination with the Court's finding of racial bloc voting, weighs heavily in favor of finding a Section 2 violation. [32]

---

[31] While the City also presented convincing evidence that efforts have been made in recent years to reverse this trend of unresponsiveness, that does not change either the fact or lingering import of the historical realities on this point.

[32] Again, the City argues that this lack of proportionality resulted from geographic housing patterns which developed over time and is not the result of intentional segregation or targeted disenfranchisement by City officials.  Once more, that point, even if true, does not alter either the reality or the dilutive effect of this extreme lack of proportionality.  City officials had the ability, and, under Section 2 ultimately the obligation, to respond to these population shifts by adjusting its election mechanisms, but did not do so.

V.      **CONCLUSION**

The Court finds that United States has proven by a preponderance of the evidence that the African-American minority group in the City of Euclid is sufficiently large and geographically compact to constitute a majority in at least one single-member district.  The government has also proven that this African-American minority group is politically cohesive and that the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate.  Indeed, despite representing over 27% of the City's voting-age population and despite 13 candidacies, until now, no African-American candidate has ever won office in Euclid.

Once the <u>Gingles</u> preconditions have been established, it is the "rare case" in which the defendants' evidence will rebut the inference that the challenged practice is discriminatory.  The Court finds that this is not that "rare case."  The Court finds that the two Senate Factors most critical to establishing a Section 2 violation, racial bloc voting and the failure to elect minority candidates have been established here.  It is undisputed, moreover, that, as of trial, none of the existing districts had an effective voting majority of African-Americans.  This fact, when combined with the Court's findings regarding racial bloc voting and the failure to elect a minority candidate, "simply overwhelm[s] those factors that might favor" the defense.  <u>Rural W. Tenn.</u>, 209 F.3d at 844.

A number of the other Senate Factors also support the Court's finding.  Specifically, as discussed above, it is clear that African-Americans in Euclid have suffered historical discrimination in housing, education, and employment that affects their ability to participate politically (Senate Factor One); that voting in Euclid is racially polarized (Senate Factor Two); that Euclid's numbered post system enhances vote dilution (Senate Factor Three); that African-Americans have a lower socioeconomic status and lower political participation rate (Senate Factor Five); and that African-

48

American candidates have been completely unsuccessful in Euclid (Senate Factor Seven).  It is undisputed, moreover, that minority voters within Euclid – despite their geographic compactness – do not form effective voting majorities in a number of legislative districts that are roughly proportionate to their respective shares in the voting age population.  This latter criterion, while not among the Senate Factors, is a critical fact warranting consideration in the totality of the circumstances.

The government has also provided evidence tending to show: that Euclid's informal slating process has largely excluded African-Americans from membership (Senate Factor Four); and that, in some, albeit rare, instances, councilmanic campaigns have employed racially charged campaign tactics (Senate Factor Six).  In addition, the government has provided evidence that supports findings that the City historically failed to respond to the needs of African-Americans, and that racial separation in Euclid's housing, and schools, serves to hamper the ability of African-American candidates to fully engage the predominately white electorate.  Again, while the latter criteria are not among the Senate Factors, they are relevant to the Court's analysis of the totality of the circumstances.

As the Court articulated in lesser detail on August 23, 2007, the Court finds that all of these factors weigh heavily against the ability of African-Americans to elect candidates of their own choosing.  For the reasons explained in this order, in addition to those articulated on the record during the August 21, 2007 preliminary injunction hearing and in the Court's August 23, 2007 Order, the Court finds that the government has proven, beyond a preponderance of the evidence, that a Section 2 violation occurred within Euclid.

49

In accordance with its finding of liability, the Court, with the aid of both parties, determined that an adequate remedy should include at least two African-American majority districts through the elimination of the four, slotted, at-large seats.  See Cottier v. City of Martin, 475 F. Supp. 2d 932, 939 (D.S.D. 2007) ("There is a strong preference for single-member districts in judicially fashioned remedial plans. Absent persuasive justification, the court's remedial plan must employ single-member districts.").  As noted above, historical housing patterns have resulted in high concentrations of African-Americans in southern Euclid.  As a result, two geographically compact majority-minority districts have been drawn in the eight-district remedial plan approved by the Court on October 29, 2007.  Through the eight-district plan jointly proposed by the City and the United States, two majority-minority districts have been created that give African-Americans an opportunity to elect candidates of choice.  On March 4, 2008, the first election was held pursuant to that remedial plan and the first African-American ever elected to Euclid's City Council was elected from one of the new majority-minority districts created by that plan.

As a final note, the Court commends the City of Euclid and the United States for their collaboration subsequent to the Court's finding of liability.  Through their sincere cooperation, the Court believes that the plan adopted is a particularly effective remedy that satisfies the requirements of Section 2 and maintains local districting principles including: the integrity of existing neighborhoods, population equality, compactness, contiguousness, and precinct lines.  The parties' diligent efforts, moreover, assured that the remedial plan would take effect in a timely fashion, with minimum disruption to the City of Euclid, the Cuyahoga County Board of Elections, and the electoral process.

50

**IT IS SO ORDERED**.

s/Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: April 16, 2008**